# Syllabus

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement

Reporter of Decisions:
Kathryn L. Loomis

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

*In re* ERWIN

Docket Nos. 153980-153981.  Argued April 12, 2018 (Calendar No. 1).  Decided July 31, 2018.

Beatrice King filed a petition in the Saginaw County Probate Court, seeking to open formal proceedings regarding the estate of her father, James Erwin, Sr., and to be appointed personal representative of the estate; the petition was granted.  James had six children from a previous marriage—including Beatrice—when he married Maggie Erwin in 1968.  James and Maggie had four children together, during which time they purchased a home in Saginaw.  In 1976, Maggie moved out of the house and established a separate residence.  James subsequently consented to a support order that provided financial assistance for Maggie and for their four children.  In 2010, James and Maggie together sued James's employer to reinstate Maggie's health insurance coverage under his retiree medical benefits.  During the proceedings, it was stated that Maggie was in poor health and that if she were to die, the loss to James would be irreparable; James made it clear that he was still married to Maggie and that they had an ongoing relationship.  James and Maggie were still legally married when James died intestate in October 2012.  Beatrice asked the court to determine whether Maggie was a surviving spouse for purposes of the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq*.  Beatrice asserted that Maggie was not a surviving spouse because she had been willfully absent from James for more than one year before his death and that Maggie was therefore ineligible under MCL 700.2801(2)(e)(*i*) to exercise her rights under EPIC.  The court, Nancy L. Thane, J., determined that Maggie was James's surviving spouse for purposes of EPIC, and Beatrice appealed.  The Court of Appeals, HOEKSTRA, P.J., and O'CONNELL and MURRAY, JJ., affirmed the probate court's orders in an unpublished per curiam opinion issued May 10, 2016 (Docket Nos. 323387 and 329264).  Beatrice sought leave to appeal, and the Supreme Court granted the application. 501 Mich 872.

In an opinion by Justice WILDER, joined in full by Chief Justice MARKMAN and Justice ZAHRA and also joined by Justice CLEMENT (except to the extent the opinion addresses whether evidence of physical absence is needed to support a finding that a spouse was willfully absent), the Supreme Court *held*:

An individual is not a surviving spouse for purposes of MCL 700.2801(2)(e)(*i*) if he or she was "willfully absent" from his or her spouse for the year or more leading up to the spouse's death.  In order to be "willfully absent," an individual must have intended to be completely

absent from his or her spouse. To determine whether a spouse was completely absent, courts should consider whether, under the totality of the circumstances, the spouse was emotionally and physically absent for the requisite period such that it resulted in a practical end to the marriage. The plain language of the statute does not require that an individual intended to abandon his or her marital rights to be found "willfully absent," only that he or she intended to be completely absent. The burden is on the party challenging an individual's status as a surviving spouse to show that he or she was "willfully absent" from the decedent spouse. *In re Peterson Estate*, 315 Mich App 423 (2016), was overruled to the extent it held that "willfully absent" encompasses only physical absence. In this case, Beatrice's claim failed because it rested solely on the allegation that Maggie was physically absent from James in the year leading up to James's death. Beatrice only presented evidence regarding their physical separation and did not refute evidence suggesting that James and Maggie retained an enduring emotional connection. Accordingly, the probate court did not clearly err by concluding that Maggie was a surviving spouse for purposes of EPIC, and the Court of Appeals correctly affirmed the probate court's order.

Affirmed.

Justice WILDER held that an individual is not a surviving spouse for purposes of MCL 700.2801(2)(e)(*i*) if he or she was "willfully absent" from his or her spouse for the year or more leading up to the spouse's death. In order to be "willfully absent," an individual must have intended to be completely absent from his or her spouse. To determine whether a spouse was completely absent, courts should consider whether, under the totality of the circumstances, the spouse was emotionally and physically absent for the requisite period such that it resulted in a practical end to the marriage. Justice WILDER also expressed the view that complete absence was required, both physical and emotional; physical absence was a necessary prerequisite for a finding of "willful absence" and a showing of emotional absence on its own was insufficient. Finally, Justice WILDER held that the plain language of the statute does not require that an individual intended to abandon his or her marital rights to be found "willfully absent," only that he or she intended to be completely absent. The burden is on the party challenging an individual's status as a surviving spouse to show that he or she was "willfully absent" from the decedent spouse. *In re Peterson Estate*, 315 Mich App 423 (2016), was overruled to the extent it held that "willfully absent" encompasses only physical absence. In this case, Beatrice's claim failed because it rested solely on the allegation that Maggie was physically absent from James in the year leading up to James's death. Beatrice only presented evidence regarding their physical separation and did not refute evidence suggesting that James and Maggie retained an enduring emotional connection. Accordingly, the probate court did not clearly err by concluding that Maggie was a surviving spouse for purposes of EPIC, and the Court of Appeals correctly affirmed the probate court's order.

Justice CLEMENT, concurring in part, agreed with the majority that the Court of Appeals correctly affirmed the probate court's finding that Maggie was not "willfully absent" from James within the meaning of MCL 700.2801(2)(e)(*i*) and that the phrase "willfully absent" is broad enough to encompass emotional absence. The facts of the case necessitated resolution of whether the term includes consideration of the emotional bonds and connections between spouses. However, because it was undisputed that Maggie was physically absent from James for one year or more before his death, it was unnecessary for the majority to consider whether the phrase also requires a physical absence.

Justice VIVIANO, joined by Justices McCORMACK and BERNSTEIN, dissenting, disagreed with the majority's analysis of the phrase "willfully absent" in MCL 700.2801(2)(e)(*i*).  In light of the dictionary definition of "absent"—that is, not present, not in company, away—the critical aspect of the phrase is the lack of physical presence.  Although there is an alternative definition of absent, "heedless; inattentive to persons present," a lack of physical presence is the more appropriate meaning given its context within the statute and the primary historical sense of the word; the definition on which the majority relied does not fit within the context of Subsection (2)(e)(*i*) because the provision requires a spouse to be absent for a year or more.  Moreover, the definition of "absent" on which the majority relied—that is, "inattentiveness"—did not support its interpretation of the phrase "willfully absent" as encompassing complete emotional absence.  Rather, that definition of "absent" on which the majority relied refers to a state of mental distraction and not to any emotional aspect; and, in any event, the majority did not cite any dictionary that combines emotional inattentiveness and physical absence into a single definition of the word "absent."  The majority rewrote the statute by knitting together two disparate and inconsistent definitions—effectively choosing a definition that incorporates "all of the above"— instead of choosing the contextually appropriate meaning.  Justice VIVIANO agreed with the majority's statement that the statute does not require proof of an intent to abandon one's marital rights before an individual can be barred from inheriting under MCL 700.2801(2)(e)(*i*) but did not agree with other statements by the majority that appeared to require an intent to initiate conduct that he or she knows would result in the termination of the marriage.  Justice VIVIANO stated that to be "*willfully* absent" for purposes of the statute, a spouse must be physically absent as a result of a unilateral decision by that spouse, as opposed to spouses who live apart by mutual choice.  Contrary to the majority's interpretation, it does not make linguistic sense to consider, for purposes of Subsection (2)(e)(*i*), whether the absence was deliberate or intentional because no reasonable person would contend that an unintentional or involuntary separation was what the Legislature was guarding against when it enacted the provision.  Reading the MCL 700.2801(2)(e)(*i*) term "absent" as meaning only physically absent would not render the provision surplusage; instead, although there is overlap between MCL 700.2801(2)(e)(*i*) (willfully absent) and MCL 700.2801(2)(e)(*ii*) (desertion), the two provisions are capable of different meanings.  The majority's definition, which departed from the plain language of the statute, was not persuasive because the definition imported perceived requirements from certain neighboring provisions into the definition of "willfully absent" and at the same time failed to address other surrounding provisions.  Because the record was sparse, Justice VIVIANO would have remanded the case to the probate court for a determination of whether Maggie was physically absent for one year or more before James's death as a result of Maggie's unilateral decision, considering any evidence bearing on the question.

©2018 State of Michigan

# OPINION

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement

FILED  July 31, 2018

STATE OF MICHIGAN

SUPREME COURT

---

*In re* Estate of JAMES ERWIN, SR.,

---

BEATRICE KING, Individually and as
Personal Representative of the ESTATE OF
JAMES ERWIN, SR.,

Appellant,

v

No. 153980

JACQUELINE E. NASH, BILLY J.
ERWIN, DEMARKIUS ERWIN, MAGGIE
ERWIN, AND STACY ERWIN OAKES,

Appellees.

---

*In re* Estate of JAMES ERWIN, SR.,

---

BEATRICE KING,

Appellant,

v                                                    No. 153981

JACQUELINE E. NASH, BILLY J.
ERWIN, DEMARKIUS ERWIN, MAGGIE
ERWIN, STACY ERWIN OAKES, and
DOUGLAS TAYLOR,

        Appellees.
_____

BEFORE THE ENTIRE BENCH

WILDER, J.

        The Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.*,
governs the distribution of an individual's property at death.  Among other reasons, the
Legislature enacted it "[t]o promote a speedy and efficient system for liquidating a
decedent's estate and making distribution to the decedent's successors."  MCL 700.1201.
EPIC grants a decedent's surviving spouse certain rights.  For example, the surviving
spouse of a decedent who dies intestate—that is, without a will— may still take a share of
the decedent's property.  MCL 700.2202(1).  In fact, even if the decedent dies testate—
with a will—a surviving spouse may take a share different from that allocated by the
will's plain terms.  MCL 700.2202(2).  However, not every spouse can rely on these
rights.  For example, a valid divorce or annulment severs such reliance.  MCL
700.2801(1).  Alternatively, a spouse living in a bigamous relationship at the time of the
decedent's death is also excluded.  MCL 700.2801(2)(d).  Although EPIC anticipates a
number of other circumstances,[1] only one is at issue in the instant case: whether the

_____

[1] For instance, a surviving spouse also does not include "[a]n individual who is a party to
a divorce or annulment proceeding with the decedent at the time of the decedent's death."

2

surviving spouse was "willfully absent" from the decedent for more than one year before his death and is therefore ineligible under MCL 700.2801(2)(e)(*i*) to exercise her rights under EPIC.

This case turns on the meaning of "willfully absent" as used in MCL 700.2801(2)(e)(*i*). In the proceeding below, the Court of Appeals concluded that "willful absence for the purposes of the EPIC is a factual question that may concern more than physical proximity," and that a "trial court should determine whether a spouse is willfully absent . . . by considering all the facts and circumstances of the case." *In re Erwin Estate*, unpublished per curiam opinion of the Court of Appeals, issued May 10, 2016 (Docket Nos. 323387 and 329264), pp 2-3. We granted leave to consider two questions, both of first impression: (1) whether the term "willfully absent" is defined exclusively by physical separation, or whether it includes consideration of the emotional bonds and connections between spouses; and (2) whether MCL 700.2801(2)(e)(*i*) requires proof that a spouse intends to abandon his or her marital rights. For the reasons now discussed, we affirm.

I

The decedent, James Erwin, Sr., had six children from a previous marriage when he married appellee Maggie Erwin in 1968. James and Maggie went on to have four

---

MCL 700.2801(3)(b). Additionally, a surviving spouse does not include "[a]n individual who, following an invalid decree or judgment of divorce or annulment obtained by the decedent, participates in a marriage ceremony with a third individual." MCL 700.2801(2)(b). See generally MCL 700.2801 for more examples.

3

children together, bringing James's total number of children to 10. Several years after their wedding, James and Maggie bought a house in Saginaw. However, although remaining in Saginaw, Maggie moved out and established a separate residence in 1976. She subsequently petitioned James for financial assistance, and James consented to a support order that provided assistance for Maggie and for their children. But the two continued to live apart. There is no indication that they ever lived under the same roof again.

Decades later, in 2010, James and Maggie joined together as plaintiffs and sued James's employer to reinstate Maggie's health insurance coverage in accordance with his retiree medical benefits. The couple was represented by L. Fallasha Erwin, James's son from his first marriage. During the proceedings, it was stated that Maggie was in poor health and that if she were to die, the loss to James would be irreparable. James made it clear that Maggie was still his wife and that they had an ongoing relationship.

On October 12, 2012, James died intestate. James and Maggie had never filed for divorce nor had they otherwise formally separated. In the eyes of the law, they very much remained married until the time of James's passing. As testament to this fact, Maggie was listed as James's surviving spouse on his death certificate.

Following his death, Maggie and James's children proceeded to sort through his estate informally. Yet all was not well with the related but distinct families that James had fathered. Apparently dissatisfied with the communication and cooperation shown by Maggie and her four children, one of James's children from his first marriage, Beatrice King, represented by her attorney-brother, L. Fallasha Erwin, petitioned the probate court to open formal proceedings and to be appointed as the estate's personal representative.

4

On June 12, 2013, eight months after James's death and with no other interested party objecting, the probate court granted Beatrice's petition.[2]

The probate court proceedings were contentious from the outset, with allegations of deceit and calls for sanctions. Both sides of James's family were involved and filed motions, only one of which is relevant to the case as it currently comes before us. In 2014, Beatrice asked the probate court to determine whether Maggie was a surviving spouse in accordance with EPIC. Beatrice argued, in part, that Maggie was not a surviving spouse under MCL 700.2801(2)(e)(*i*) because she was "willfully absent" from James in the years leading up to his death. If proved, because James died intestate, Maggie would not be an heir for the purposes of inheritance. She would not be entitled to a share of James's estate.

On May 31, 2014, the probate court held a hearing on Beatrice's motion, and on July 17, 2014, it decided that motion in Maggie's favor in a written opinion, ruling that Maggie was James's surviving spouse. Beatrice appealed, and the Court of Appeals affirmed the probate court's ruling. We subsequently granted Beatrice's application for leave to appeal, limited to the two questions described earlier.

---

[2] The personal representative's duties include settling and distributing the decedent's estate in accordance with EPIC, "as expeditiously and efficiently as is consistent with the best interests of the estate." MCL 700.3703(1). In effect, the personal representative is in charge of the day-to-day probate proceedings and is answerable to the court. Although no interested party objected to Beatrice's appointment, allegations later surfaced that Maggie and her children had been misled to believe that Beatrice was not pursuing the position. L. Fallasha and Beatrice denied that charge.

5

II

We review de novo questions of statutory interpretation. *People v Buehler*, 477 Mich 18, 23; 727 NW2d 127 (2007). However, any underlying findings of fact are reviewed only for clear error. *People v Knight*, 473 Mich 324, 338; 701 NW2d 715 (2005); see MCR 2.613(C).

III

A

For the purposes of EPIC, a surviving spouse does not include

[a]n individual who . . . for 1 year or more before the death of the deceased person:

   (*i*) Was willfully absent from the decedent spouse. [MCL 700.2801(2)(e).]

With this in mind, we turn to the first question: whether the term "willfully absent" is defined exclusively by physical separation, or whether it includes consideration of the emotional bonds and connections between spouses?

1

As an initial matter, we note that EPIC does not define the term "willfully absent." Because our goal is to glean legislative intent from the plain meaning of statutory language, *Wickens v Oakwood Healthcare Sys*, 465 Mich 53, 60; 631 NW2d 686 (2001), the dictionary is our first point of reference to determine the term's significance, *People v Morey*, 461 Mich 325, 330; 603 NW2d 250 (1999). The common understanding and the traditional legal usage of a term also guide our interpretation. *People v Thompson*, 477 Mich 146, 151-152; 730 NW2d 708 (2007); see also MCL 8.3a ("All words and phrases

6

shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.").

MCL 700.2801(2)(e)(*i*) uses the term "absent" as an adjective to describe a person's conduct in relation to his or her spouse. In this context, "absent" could mean that someone is missing, not present, or, alternatively, that a person is exhibiting inattentiveness toward another. *The American Heritage Dictionary* (2d ed); *Merriam-Webster's Collegiate Dictionary* (11th ed).[3] The word "willful," whether or not used as a legal term of art, describes an act that is voluntary, deliberate and intentional. *Random House Webster's* (2d ed); *Black's Law Dictionary* (8th ed). But the intent to commit any act does not, by itself, render it "willful." Rather, a "willful" act is one that is taken with the intent to do something specific. *Jennings v Southwood*, 446 Mich 125, 140; 521 NW2d 230 (1994); cf. *People v Beaudin*, 417 Mich 570, 575; 339 NW2d 461 (1983) (explaining that a willful act is one committed with the specific intent to bring about the particular result the statute seeks to prohibit).[4] Taken together, these definitions indicate

---

[3] We agree with the dissent that there is no meaningful difference between the dictionary definitions cited in this opinion and those cited by the dissent. See *post* at 5 n 11.

[4] The dissent would prefer to understand "willful" to mean "to make a decision on one's own, without regard to others,", or, as it later characterizes it, to make a "unilateral decision." *Post* at 14. The dissent argues that this is how the term is commonly understood in the "context of human interaction," because "[l]inguistically, it does not make much sense to think of a person's absence from their spouse under EPIC in terms of whether the absence was 'deliberate' or 'intentional.'" *Post* at 10. We find this reasoning unpersuasive. After all, although some "deliberate" decisions may not be

7

that the phrase "willfully absent," as used in MCL 700.2801(2)(e)(*i*), requires that the surviving spouse act with the intent to be away from his or her spouse for a continuous period of one year immediately preceding the death.

However, while the plain language of MCL 700.2801(2)(e)(*i*) suggests that the term "absent" may refer to physical separation or a lack of emotional support in the form of inattentiveness, it does not tell us specifically whether the term refers exclusively to the physical or whether it includes an emotional element. As such, we turn to neighboring statutory provisions for additional context. See *Robinson v City of Lansing*, 486 Mich 1, 15; 782 NW2d 171 (2010) ("[I]t is . . . well established that to discern the Legislature's intent, statutory provisions are *not* to be read in isolation; rather, context matters, and thus statutory provisions are to be read as a whole."); *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 533; 697 NW2d 895 (2005) (noting that the meaning of statutory language, plain or otherwise, always depends on context). With regard to the neighboring provisions, in addition to excluding one who is "willfully absent," the definition of surviving spouse also excludes those

> who did any of the following for 1 year or more before the death of the deceased person:
>
> * * *
>
> (*ii*) Deserted the decedent spouse.

---

"unilateral," all "unilateral" decisions are, by their very nature, "deliberate." Moreover, unlike the dissent, we have at least cited caselaw that supports our understanding of willful as an act that is taken with the intent to do something specific.

> (*iii*) Willfully neglected or refused to provide support for the decedent spouse if required to do so by law. [MCL 700.2801(2)(e).]

Taking MCL 700.2801(2)(e)(*ii*) first, when deployed as a transitive verb, as here, the term "to desert" is commonly used as a synonym for abandon—to forsake or leave someone. *The American Heritage Dictionary* (2d ed); *Merriam-Webster's Collegiate Dictionary* (11th ed). This common meaning mirrors the traditional legal usage of the term "desertion" in the context of divorce. In that context, a husband or wife deserted his or her spouse when the husband or wife ceased cohabitation and physically departed without the intent to return. *Fanner v Fanner*, 326 Mich 466, 467; 40 NW2d 225 (1949); see also *People v Dunston*, 173 Mich 368, 373; 138 NW 1047 (1912) (noting that, for purposes of the crime of desertion or abandonment, the term "desertion" meant to separate physically without the intent to resume martial relations).[5] Therefore, although in theory an individual could desert a spouse emotionally, the verb's common connotation in conjunction with its traditional legal meaning tells us that MCL 700.2801(2)(e)(*ii*) most likely uses the term "deserted" to describe a purely physical distance. Accordingly, an individual deserts his or her spouse within the meaning of MCL 700.2801(2)(e)(*ii*) if he or she physically leaves the marital home with the intent never to return and the spouse dies more than a year later.

---

[5] The traditional use of desertion as a ground for divorce has disappeared since the Legislature enacted the no-fault divorce act, 1971 PA 75, in 1971. *Sparks v Sparks*, 440 Mich 141, 156-157; 485 NW2d 893 (1992). Since that time, a divorce can be sought on the basis that there has been "a breakdown of the marriage relationship to the extent that the objects of matrimony have been destroyed and there remains no reasonable likelihood that the marriage can be preserved." MCL 552.6(1). Nothing more is required.

MCL 700.2801(2)(e)(*ii*) permits us to draw an important inference.  If we interpret the word "absent" as used in MCL 700.2801(2)(e)(*i*) to refer only to physical absence, there would be an almost complete overlap between MCL 700.2801(2)(e)(*i*) and (*ii*).  That is, an individual who "deserts" his or her spouse in the year or more before the spouse's death will always have been "willfully absent."[6]  This would render MCL 700.2801(2)(e)(*i*) redundant and counsels against equating the term solely with physical absence.  *Wickens*, 465 Mich at 60.[7]

Next, we examine MCL 700.2801(2)(e)(*iii*).  A natural reading of that subparagraph indicates that the phrase "to provide support for the decedent spouse if required to do so by law" modifies the verbs "refused" and "neglected."  Therefore, an individual is not a surviving spouse within the meaning of MCL 700.2801(2)(e)(*iii*) if he or she "[w]illfully neglected . . . to provide support for the decedent spouse if required to do so by law," or "refused to provide support for the decedent spouse if required to do so by law."

---

[6] The difference between the two provisions would turn on whether there was an intent to leave and never return as in MCL 700.2801(2)(e)(*ii*), or simply an intent to leave as in MCL 700.2801(2)(e)(*i*).  In practice then, if the subsections were both interpreted to involve physical separation only, a party would never need to demonstrate a spouse's intent never to return.  It would be simpler just to argue that the spouse intended to leave.

[7] The dissent disagrees that MCL 700.2801(2)(e)(*i*) would be rendered redundant if the term "absent" were interpreted to encompass only physical absence.  See *post* at 13.  Assuming the validity of the law cited by the dissent as it relates to a now-defunct component of domestic-relations law, see note 5 of this opinion, the fact remains that if absence under MCL 700.2801(2)(e)(*i*) were limited to physical absence, for practical purposes, a party would never need to demonstrate a spouse's intent not to return.  See note 6 of this opinion.

10

Generally, spousal support is mandated by law only in two situations. The first involves divorce. MCL 552.23. However, divorcees are not surviving spouses for the purposes of EPIC. MCL 700.2801(1). As a result, MCL 700.2801(2)(e)(*iii*) cannot be referring to spousal support following a divorce. See *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715, 717 (2002) ("Courts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory."). That leaves an action for separate maintenance—the second situation in which spousal support can be mandated—which can be filed by an individual based on the same grounds as an action for divorce, MCL 552.7, but in circumstances in which a divorce is not pursued or cannot be obtained.

As already stated, the word "willfully" refers to an intent to do something specific. "Neglected," on the other hand, means to fail to give the proper attention to something, or otherwise to leave it undone; "refused" simply means to decline to do something. *The American Heritage Dictionary* (2d ed); *Merriam-Webster's Collegiate Dictionary* (11th ed). Accordingly, for the purposes of MCL 700.2801(2)(e)(*iii*), an individual is not a surviving spouse if he or she intentionally fails or flatly refuses to pay legally required separate maintenance for the year or more leading up to his or her spouse's death.

When viewed side-by-side, it becomes clear that MCL 700.2801(2)(e)(*ii*) and (*iii*) are not connected by an individual's physical proximity in relation to his or her spouse, and we cannot therefore infer that MCL 700.2801(2)(e)(*i*) refers solely to physical absence by its mere association with its neighboring provisions. Cf. *People v Jackson*, 487 Mich 783, 791; 790 NW2d 340 (2010) (denoting that neighboring statutory

11

provisions should be read in harmony with one another). Yet, another connection does bond these otherwise disparate subsections. Both MCL 700.2801(2)(e)(*ii*) and (*iii*) describe acts on behalf of a surviving spouse that for all intents and purposes are inconsistent with the very existence of a legal marriage. This is either by a spouse refusing to provide required support or by simply abandoning the other without an intent to return. In other words, MCL 700.2801(2)(e)(*ii*) and (*iii*) involve intentional acts that bring about a situation of divorce in practice, even when the legal marriage has not been formally dissolved. MCL 700.2801(2)(e)(*i*) should be interpreted with this context in mind. See *Madugula v Taub*, 496 Mich 685, 696; 853 NW2d 75 (2014) (explaining that statutory provisions must be interpreted in the context of the law as a whole).[8]

A comprehensive review of the statutory scheme confirms that the term "willfully absent" should be interpreted consistently with this observation. See *Jackson*, 487 Mich at 791. Not only is "[a]n individual who is divorced from the decedent or whose marriage to the decedent has been annulled . . . not a surviving spouse" for purposes of EPIC, MCL 700.2801(1), but also "[a]n individual who obtains or consents to a final decree or judgment of divorce from the decedent or an annulment of their marriage, which decree or judgment is not recognized as valid in [Michigan]" is not a surviving

---

[8] The dissent accuses us of failing to apply any canon of statutory interpretation in coming to this conclusion. *Post* at 13 n 37. It is true that we have not explicitly named the canons in our opinion, and we were unaware that such formulism was necessary to render a proper textualist decision. Yet a careful reading of our opinion and accompanying citations clearly illustrates that we have applied the established rules of interpretation. See, e.g., *Robinson*, 486 Mich at 15; *Griffith*, 472 Mich at 533; *Jackson*, 487 Mich at 791.

spouse," MCL 700.2801(2)(a). And this includes "[a]n individual who, following an invalid decree or judgment of divorce or annulment obtained by the decedent, participates in a marriage ceremony with a third individual." MCL 700.2801(2)(b). These provisions all describe a situation in which, in effect, a spouse has initiated conduct that results in the complete dissolution of his or her marriage, either in fact or in practice. In those circumstances, an individual, even if legally a surviving spouse, cannot avail himself or herself of all the statutory rights inherent with that title.

Taking all this into consideration, it is clear that the term "willfully absent" cannot be defined exclusively by physical separation. Simply put, there must be something more than a mere physical distance. There are, after all, countless situations in which spouses choose to be physically separated but do not want to interrupt or even weaken their marital relationship. Some married couples are separated by occupation—for example, when a spouse intentionally takes a better job in a neighboring region so that he or she may provide more comfortably for their family—while others are separated by civic duty—like when a member of the armed forces is deployed overseas in service to this nation. But these circumstances alone reveal no desire to destroy or undermine the marriage, and a committed spouse should not forfeit his or her inheritance on the basis of the erroneous assumption that a physical distance prevented the continued pursuit of an otherwise loving and supportive relationship. If two married people decide to live apart but maintain an element of emotional support and contact, courts have no business second-guessing that life decision.

As a result, when MCL 700.2801(2)(e)(*i*) is read in this proper context, the following explication becomes clear: willful absence requires consideration of the totality

13

of the circumstances. It presents a factual question for the trial court to answer: whether a spouse's complete absence brought about a practical end to the marriage.[9] The burden is on the party challenging a legal spouse's status to show that the spouse was in fact "willfully absent" for the year or more leading up to the decedent's death. See *In re LaFreniere's Estate*, 316 Mich 285, 291; 25 NW2d 252 (1946) ("[W]here exceptions to an account are of an affirmative nature . . . the burden of sustaining such exceptions rests on the contestant."). Although an intentional physical absence is necessary to a finding of willful absence, without additional indicia of a complete absence in terms of emotional support and contact, courts should conclude that the marriage endured and allow the remaining legal spouse to retain his or her "surviving spouse" status. [10]

2

The dissent contends that "absent" in this context refers only to physical absence. In doing so, it states that the "critical aspect" of absence is the lack of physical presence, because a dictionary defines "absent" as "not present" or "away." *Post* at 5. Unfortunately, the sum total of the dissent's analysis on this point is a string citation to dictionaries that define absence in terms of physical presence. See *post* at 5 n 13. We do

---

[9] Rather than an unworkable focus on how inattentive a spouse must be in order to be "absent" within the meaning of MCL 700.2801(2)(e)(*i*), see *post* at 6 n 17, instead, the trial court should ascertain whether that spouse has been *completely* absent from the other, both emotionally and physically.

[10] Forfeitures are not favored in law. *Miller v Pond*, 214 Mich 186, 190; 183 NW 24 (1921). This general rule supports our conclusion that neither physical nor emotional absence in isolation is sufficient for purposes of MCL 700.2801(2)(e)(*i*). Rather, a complete absence is required, both physical *and* emotional.

not disagree that "absent" can be understood in physical terms. And we are not surprised to find that multiple dictionaries define absence in this way. The question here is not whether physical absence is a "critical aspect" of absence in general—we agree that it is in this case—but whether, in the context of MCL 700.2801(2)(e)(*i*), absence relates solely to physical absence. This is where our disagreement lies.

While the dissent apparently agrees that "absent" can be defined as either a lack of physical presence or emotional inattentiveness, see *post* at 5-6, it nonetheless argues that these definitions are mutually exclusive and that therefore it is improper to define "absent" to encompass both definitions, see *post* at 8 n 26 ("[O]ne definition requires a person to be *physically absent*, i.e., "not present; not in company; away," while the other, as it pertains to human interaction, requires in its ordinary usage a person to be *physically present . . . .*"). We disagree with the dissent that in order to be "inattentive" one must also be "physically present." One who is physically absent can still be "attentive" by providing emotional support and communication; conversely, one who is physically absent can also be "inattentive" by withholding emotional support and communication.[11] Accordingly, we do not believe that physical distance and inattentiveness are "logically

---

[11] Despite the dissent's own proclamations to the contrary, there is nothing outlandish about stating that emotional support and communication can be absent from a personal relationship, nor with characterizing one who withholds such support as being emotionally absent from that relationship. The dissent's chosen dictionary definitions do not undermine this point. Cf. *post* at 7 (stating that dictionaries refer to absence in various ways, including, but not limited to, " '[not] attentive,' " " 'inattentive,' " and " 'paying no attention to' ") (citations omitted).

15

inconsistent," *post* at 8 n 26, because neither concept is necessarily dependent upon the other.[12]

More fundamentally, the dissent contends that when interpreting a statute, the interpreter must choose the single most appropriate dictionary definition of a term, rather than relying on multiple definitions. See *post* at 8. The dissent also contends that "[b]y knitting together . . . disparate definitions, the majority creates its own definition . . . instead of choosing the contextually appropriate meaning." *Post* at 8. We disagree. When consulting a dictionary, this Court does not relinquish its duty to exercise its best interpretive judgment. In this way, the dictionary should be seen as a tool to facilitate those judgments, not conclusively resolve linguistic questions.[13] It is one thing to "knit

---

[12] The dissent cites a dictionary that defines the term "absent," in part, in relation to physical proximity. See *post* at 5 ("[H]eedless; inattentive to persons present or to subjects of conversation in company.") (quotation marks and citation omitted). However, "heedless" can be defined as "INCONSIDERATE" or "THOUGHTLESS," *Merriam-Webster's Collegiate Dictionary* (11th ed), the understandings of which are not inconsistent with a finding of physical presence. Contra *post* at 8 n 26 ("[O]ne definition requires a person to be *physically absent* . . . while the other, as it pertains to human interaction, requires a person to be *physically present* . . . ."). Moreover, other dictionaries define "absent" as merely meaning "inattentive," without regard to whether there is a physical presence. See *Webster's Third New International Dictionary* ("INATTENTIVE"); *The American Heritage Dictionary of the English Language* (5th ed) ("[e]xhibiting or feeling inattentiveness"); *The Random House Dictionary of The English Language* (2d ed) ("not attentive; preoccupied; absent-minded"). For this reason, we consider the dissent's insinuation that we are engaging in "definition-shopping" to be extravagant. See *post* at 8 n 27 ("There are many ways that 'an uncritical approach to dictionaries can mislead judges.'. . . Not surprisingly, definition-shopping is high on the list.") (citation omitted).

[13] See *Yates v United States*, 574 US ___, ___; 135 S Ct 1074, 1081; 191 L Ed 2d 64 (2015) (opinion by Ginsburg, J.) (explaining that dictionary definitions bear consideration in determining the meaning of a word but that they are not always dispositive); *id*. at

together" disparate and incompatible definitions, as, for example, by concluding that a "horse" refers both to the familiar animal and also to a frame or structure on which something is mounted or supported. It is quite another to insist on a single definition when there are multiple choices with slight shades of different meaning, each of which is reasonably understood to apply to a term in a particular context. Unlike the dissent, we believe that "absent" is a term broad enough to reasonably encompass both cited definitions and that the overall context and manifest purpose of the statute under inquiry renders both definitions appropriately applicable. These two definitions are not in tension in any way, they are not logically incompatible in any manner, and each describes a subtly different understanding of "absent" that is both relevant and necessary to give full and complete meaning to the statute at issue here.

"Absent" in the course of describing a human relationship, particularly that between husband and wife, might fairly describe aspects of *both* physical and emotional proximity. The dissent is entitled to yoke itself to a single definition that remains within the boundaries set forth by a single dictionary, but we prefer to rely on the dictionary as a tool for supplying the most reasonable definition of a term in its most relevant context. The Legislature is not confined to a single dictionary definition of a term when enacting a law and neither should this Court be so limited when interpreting that law. The

---

1092 (Kagan, J., dissenting) (agreeing that dictionary definitions do not control if other textual markers suggest that a different definition is appropriate); see also *Krohn v Home-Owners Ins Co*, 490 Mich 145, 156; 802 NW2d 281 (2011) (stating that courts *may* consult a dictionary to give words their common and ordinary meaning not that they *must* consult a dictionary or that they must choose a single definition from among many).

17

dictionary is but one data point; it guides our analysis, but it does not by itself settle it. The primary obligation of this Court "is to ascertain and effectuate the intent of the Legislature" in light of the language of the statutory provision and the context in which it appears. *Lash v Traverse City*, 479 Mich 180, 187; 735 NW2d 628 (2007). We believe that we have reasonably interpreted the text at issue and that we have thus fulfilled this duty.

For the reasons stated, we conclude that, in this context, "absent" is most reasonably defined as referring to complete physical and emotional absence from the deceased spouse. This definition is consistent with the statutory scheme as a whole, which contemplates that one only loses his or her status as a "surviving spouse" if he or she takes action that is akin to a complete repudiation of the marriage. Moreover, this interpretation gives independent meaning to the "desertion" and "willfully absent" provisions and avoids rendering either provision redundant.

3

In the proceeding below, the Court of Appeals came to a similar conclusion. It ruled that "willful absence for the purposes of the EPIC is a factual question that may concern more than physical proximity." *Erwin*, unpub op at 3. As with our analysis, the Court of Appeals observed that a dictionary alone could not resolve the question before it, *id*. at 3-4, and it also turned to MCL 700.2801(2)(e)(*ii*) and (*iii*) to develop its view that mere physical separation was insufficient, *id*. at 4. Rather than sticking with a purely textual analysis, the Court of Appeals considered past precedent. The Court noted that an earlier case, *In re Harris Estate*, 151 Mich App 780; 391 NW2d 487 (1986), had

18

construed a similarly worded statute, see MCL 700.290, as amended by 1980 PA 396,[14] and that the Court of Appeals in *Harris* had determined that the term "willfully absent" "encompassed 'emotional as well as physical absence . . . .' " *Erwin*, unpub op at 4, quoting *Harris*, 151 Mich App at 785. As the *Erwin* Court observed, the *Harris* Court had reasoned that " '[p]hysical presence in the marital home is strong evidence that the party remains involved in the marriage to some degree' " and that "a non-surviving spouse must show 'actions indicating a conscious decision to permanently no longer be involved in the marriage.' " *Erwin*, unpub op at 4 (alteration in original), quoting *Harris*, 151 Mich App at 786. The *Erwin* Court then held that a "physical separation [was] only one piece of evidence that the trial court may consider and weigh when determining whether one spouse was willfully absent from another." *Erwin*, unpub op at 5.

Yet in *In re Peterson Estate*, 315 Mich App 423; 889 NW2d 753 (2016), which was decided just weeks after the instant case, the Court of Appeals came to a different determination. There, the Court of Appeals held that the phrase "willfully absent," as used in MCL 700.2801(2)(e)(*i*), referred to physical absence only. *Id*. at 432. Relying on a dictionary definition, the Court suggested that "[t]he word 'absent' ordinarily refers to

---

[14] As the Court of Appeals noted in *Harris*, "[t]he Revised Probate Code provides that a surviving spouse may elect against the will of his deceased spouse . . . and may claim certain allowances from the estate. However, MCL.§ 700.290 . . . states that the rights provided by such statutes are forfeited if the surviving spouse 'did any of the following for 1 year or more previous to the death of the deceased spouse: (a) Was *wilfully absent* from the decedent spouse.' " *Harris*, 151 Mich App at 783, quoting MCL 700.290 (citations omitted; emphasis added). As can be seen, and as the Court of Appeals in *Erwin* noted, the language of the now-repealed MCL 700.290 is almost identical to the language of MCL 700.2801. *Erwin*, unpub op at 4.

19

being physically away." *Id.*, citing *The Oxford English Dictionary* (2d ed). And although the Court of Appeals recognized that absence could figuratively refer to both physical proximity and emotional support, without clear direction from the statutory text, it limited the term to the former meaning. *Peterson*, 315 Mich App at 432. Interestingly, the Court of Appeals in *Peterson* also reviewed the earlier decision in *Harris*. But it determined that the *Harris* Court had concluded that "willfully absent" referred solely to physical absence. *Id.* at 431-432. The Court of Appeals in *Peterson* therefore saw *Harris* as supporting its position that the term "willfully absent," as used in MCL 700.2801(2)(e)(*i*), encompassed only physical absence. *Id.* at 432. In that Court's view, an individual was not a surviving spouse for purposes of MCL 700.2801(2)(e)(*i*), if he or she was intentionally physically absent from his or her spouse for the year or more leading up to the spouse's passing. *Id.* at 432-433.

We agree with the Court of Appeals' analysis in the case at bar and reiterate that an individual is not a surviving spouse for purposes of MCL 700.2801(2)(e)(*i*) if he or she intended to be both physically and emotionally absent for the year or more leading up to the deceased spouse's passing. *Peterson* is overruled to the extent that it concluded otherwise.[15]

---

[15] However, we agree with the Court of Appeals' conclusion in *Peterson* that the absence described in MCL 700.2801(2)(e)(*i*) must be continuous for at least a year leading up to the spouse's death. *Peterson*, 315 Mich App at 432-433. We also agree that the statute does not require the surviving spouse to make a continuous effort to maintain the marital relationship. *Id.* at 434. That is, the inquiry is into whether the surviving spouse did the "absenting," not whether the surviving spouse did enough to prevent the absence.

B

We now turn to the second question: whether MCL 700.2801(2)(e)(*i*) requires proof that a spouse intended to abandon his or her marital rights?

We note that the plain language of the statute evinces no express requirement that an individual intend to abandon his or her marital rights before being excluded as a surviving spouse pursuant to MCL 700.2801(2)(e)(*i*). Indeed, the statute's text clearly includes a different requisite intent: that of being "willfully" absent. We are not at liberty to ignore this unambiguous legislative directive. *People v McIntire*, 461 Mich 147, 153; 599 NW2d 102 (1999). As a result, the only intent that a spouse must have is to be "absent." Therefore, a party seeking to establish that a spouse is not a surviving spouse pursuant to MCL 700.2801(2)(e)(*i*) does not need to show that the spouse intended to dissolve the marriage, only that the surviving spouse intended to be absent from the decedent spouse.

The notion that MCL 700.2801(2)(e)(*i*) requires a showing that an individual intended to abandon his or her marital rights comes from *In re Harris*. The Court of Appeals read that intent into the statute in light of its recognition that forfeitures are disfavored in the eyes of the law. *Harris*, 151 Mich App at 786, citing *Miller v Pond*, 214 Mich 186; 183 NW 24 (1921). When rendering its decision, the *Peterson* Court disagreed with the conclusion reached in *Harris*, stating that "[t]he Legislature did not include such a requirement, and we are not at liberty to read one into the statute." *Peterson*, 315 Mich App at 433. We agree with the conclusion reached by *Peterson*.

21

MCL 700.2801(2)(e)(*i*) does not require proof that a spouse intends to abandon his or her marital rights.[16]  Courts should not resort to judicial construction when the words of the Legislature are clear and unambiguous.  *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 27; 528 NW2d 681 (1995).

IV

In the present case, the following is not in dispute.  James and Maggie were married in 1968.  In 1973 they bought a martial home together in Saginaw as tenants by the entireties.  Maggie left the marital home in 1975 and took residence at a separate address, but she remained only a few miles away, still in Saginaw.  Shortly thereafter, she sought financial support and James agreed to pay.  Neither party disagrees that Maggie was physically absent from the martial home in the years that followed, intentionally so, and neither party disputes that James and Maggie Erwin remained legally married until James's death.  Maggie is even listed as the surviving spouse on James's death certificate, and she is the named beneficiary of his life insurance policy.  Therefore, the question is whether, given the totality of the circumstances, Maggie intended to be physically and emotionally absent from James, resulting in a practical end to their marriage?

---

[16] The dissent insinuates that we agree with the *Peterson* Court on the one hand but disagree with it on the other.  See *post* at 9 n 28.  This misconstrues our position, in which we illustrate that there is a difference between actions taken with the intent to abandon martial rights and actions taken that have the practical effect of ending a marriage regardless of the intent.  In other words, 'willful,' as used in this provision, refers to an intent to be completely absent, which effectively results in a practical end of the marriage, regardless of whether the spouse specifically intended to end the marriage when he or she took such action.

22

Unfortunately for Beatrice, the record in this case is sparse. Before the probate court, Beatrice asserted that Maggie was not a surviving spouse and moved for a declaration of her status as a nonsurviving spouse pursuant to EPIC. But her claim rested solely on the allegation that Maggie and James did not cohabitate for over 36 years, and she provided nothing more in support of her claim than evidence of this fact. Beatrice never argued that Maggie and James had severed all emotional connections or that they did not in some way provide one another with emotional support. And other evidence in the record—specifically that in 2010 James filed a breach of contract action against his employer to ensure that the employer resumed providing medical coverage to Maggie as James's spouse—suggests that James and Maggie remained married up until the time of James's death. At a minimum, this lawsuit indicates that, not long before his death, James felt that losing Maggie would have been an irreparable loss and that in his eyes and hers, they were still husband and wife. As already stated, while physical separation is necessary for a finding that a spouse is not a surviving spouse for the purposes of EPIC, physical separation alone is insufficient. Because Beatrice only provided evidence of physical separation between Maggie and James and did not refute the evidence tending to show the enduring emotional connections between them, her claim necessarily fails.[17]

---

[17] In earlier proceedings, Beatrice objected to the legitimacy of the evidence relating to the 2010 action against James's employer to reinstate healthcare coverage for Maggie as James's spouse. But we observe that the healthcare case was handled by Beatrice's brother and current attorney, L. Fallasha Erwin, who has freely admitted that he argued in the healthcare case that James and Maggie were still married.

On the meager record before it, the probate court understandably ruled that Maggie was the surviving spouse of James for purposes of EPIC. The probate court recognized that the couple had not resided together for many years but found that the couple had chosen a separated lifestyle rather than a complete end to their marriage. In the probate court's eyes, the couple's relationship was ongoing and included contact up until James's death. We find no clear error in this factual determination. The probate court could only rule on the evidence before it.

The Court of Appeals correctly affirmed the probate court. It observed that Beatrice had argued solely that Maggie and James were physically separated for more than a year and that this evidence was insufficient as a matter of law to establish that Maggie was "willfully absent." We agree with the Court of Appeals' conclusion and affirm.

V

We hold that an individual is not a surviving spouse for the purposes of MCL 700.2801(2)(e)(*i*) if he or she intended to be absent from his or her spouse for the year or more leading up to the spouse's death. Absence in this context presents a factual inquiry based on the totality of the circumstances, and courts should evaluate whether complete physical and emotional absence existed, resulting in an end to the marriage for practical purposes.[18] The burden is on the party challenging an individual's status as a surviving

---

[18] We agree with the dissent that the interpretation of a statute is a purely legal question and that statutory interpretation presents a question of law. See *post* at 2 n 2. Having defined the statutory term "willfully absent" as meaning complete emotional and physical absence from the marriage, we believe it prudent and perhaps instructive to offer

24

spouse to show that he or she was "willfully absent," physically and emotionally, from the decedent spouse. Because the Court of Appeals in the present case correctly concluded that Maggie was not "willfully absent" from James in the years leading up to his death, we affirm.

Kurtis T. Wilder
Stephen J. Markman
Brian K. Zahra
Elizabeth T. Clement (except to the extent the opinion addresses whether evidence of physical absence is needed to support a finding that a spouse was willfully absent)

---

guidance to trial courts that in order to ascertain whether complete absence existed, an inquiry into the facts of the case may be required. Accord *post* at 14 n 38 (stating that the dissent would direct the trial court to consider all the facts at its disposal). For this reason, we reject the dissent's accusation that we put the "cart before the horse." *Post* at 2 n 2.

*In re* Estate of JAMES ERWIN, SR.,

_____

BEATRICE KING, Individually and as
Personal Representative of the ESTATE OF
JAMES ERWIN, SR.,

        Appellant,

v                           No. 153980

JACQUELINE E. NASH, BILLY J.
ERWIN, DEMARKIUS ERWIN, MAGGIE
ERWIN, and STACY ERWIN OAKES,

        Appellees.

_____

*In re* Estate of JAMES ERWIN, SR.,

_____

BEATRICE KING,

        Appellant,

v                           No. 153981

JACQUELINE E. NASH, BILLY J.
ERWIN, DEMARKIUS ERWIN, MAGGIE
ERWIN, STACY ERWIN OAKES, and
DOUGLAS TAYLOR,

        Appellees.

_____

CLEMENT, J. (*concurring in part*).

I support the result reached by the majority—the Court of Appeals rightly affirmed the trial court's finding that Maggie was not "willfully absent" from James. I also agree with the majority that the term "willfully absent" is broad enough to encompass emotional absence. But I write separately because I do not support the majority's proposition that "intentional physical absence is necessary" to support a finding that a spouse is "willfully absent" under MCL 700.2801(2)(e)(*i*). *Ante* at 14.

This case squarely presents the question whether the term "willfully absent" in MCL 700.2801(2)(e)(*i*) "includes consideration of the emotional bonds and connections between spouses," *ante* at 3, and so it is proper for the majority (and the dissent for that matter) to wrestle with that question. But this case does not present the question whether the term "willfully absent" requires physical absence; nor do the facts of this case allow that proposition to be tested since neither party disputes that Maggie was physically absent from James. See *ante* at 22; *post* at 14. In short, the majority's proposition in no way bears on the outcome of this case, and so I view the proposition as obiter dictum.

To be fair, a physical-absence requirement is unlikely to cause mischief—I don't doubt that in a typical case, a finding that a spouse was "willfully absent" will be supported by, among other things, record evidence of physical absence. But I would prefer that the majority's proposition become enshrined in law only after we consider a case in which that proposition plays a deciding role.

Elizabeth T. Clement

2

*In re* Estate of JAMES ERWIN, SR.,

_____

BEATRICE KING, Individually and as
Personal Representative of the ESTATE OF
JAMES ERWIN, SR.,

        Appellant,

v                                   No. 153980

JACQUELINE E. NASH, BILLY J.
ERWIN, DEMARKIUS ERWIN, MAGGIE
ERWIN, and STACY ERWIN OAKES,

        Appellees.

_____

In re Estate of JAMES ERWIN, SR.,

_____

BEATRICE KING,

        Appellant,

v                                   No. 153981

JACQUELINE E. NASH, BILLY J.
ERWIN, DEMARKIUS ERWIN, MAGGIE
ERWIN, STACY ERWIN OAKES, and
DOUGLAS TAYLOR,

        Appellees.

_____

VIVIANO, J. (*dissenting*).

The majority today holds "that an individual is not a surviving spouse for the purposes of MCL 700.2801(2)(e)(*i*) if he or she intended to be absent from his or her spouse for the year or more leading up to the spouse's death."[1]  Further, the majority states that "[a]bsence in this context presents a factual inquiry based on the totality of the circumstances, and courts should evaluate whether *complete physical and emotional absence existed, resulting in an end to the marriage for practical purposes*."[2]  Because I conclude that the "willfully absent" provision in the forfeiture statute, MCL 700.2801(2)(e)(*i*), by its plain language, refers to a person who is physically absent from the decedent spouse as a result of his or her unilateral decision, I dissent.

James Erwin, Sr., died intestate and, consequently, MCL 700.2101(1) of the Estates and Protected Individuals Code (EPIC)[3] controls the disposition of his estate. Under EPIC, a surviving spouse is entitled to an intestate share from his or her decedent spouse's estate.[4]  Appellee Maggie Erwin seeks to collect, as James's surviving spouse, this share from James's estate.  Appellant Beatrice King challenges Maggie's status as a surviving spouse under EPIC's forfeiture provision, MCL 700.2801, alleging that Maggie

---

[1] *Ante* at 24.

[2] *Ante* at 24 (emphasis added).  I do not understand why the majority frames this issue as a "factual inquiry" when the interpretation of a statute is a purely legal question.  See, e.g., *Koontz v Ameritech Servs Inc*, 466 Mich 304, 309; 645 NW2d 34 (2002) ("Issues of statutory interpretation are questions of law that we review de novo.").  The majority appears to be putting the cart before the horse.

[3] MCL 700.1101 *et seq.*

[4] MCL 700.2102.

2

"[w]as willfully absent from the decedent spouse"[5] and therefore cannot take the surviving-spouse share. Thus, this case turns on the proper meaning of "willfully absent."

The statute, in relevant part, lists three situations in which a "surviving spouse" forfeits his or her entitlement to collect the intestate share:

> An individual who did any of the following for 1 year or more before the death of the deceased person:
>
> (*i*) Was willfully absent from the decedent spouse.
>
> (*ii*) Deserted the decedent spouse.
>
> (*iii*) Willfully neglected or refused to provide support for the decedent spouse if required to do so by law.[6]

This provision was first added as part of the Revised Probate Code (RPC), which was enacted in 1978.[7] When the RPC was later replaced by EPIC in 2000, the forfeiture provision remained substantively unchanged.[8]

---

[5] MCL 700.2801(e)(*i*).

[6] MCL 700.2801(2)(e).

[7] 1978 PA 642, § 290; see also Lowe, *EPIC—New Probate and Trust Legislation for the New Millennium*, 79 Mich B J 330 (2000); see also V Michigan Compiled Laws of 1979, § 700.141 (stating that the statute was "[n]ew 1978, p 2470, Act 642, Eff. July 1, 1979").

[8] 1998 PA 386, § 2801(2)(e)(*ii*), effective Apr 1, 2000. The RPC and EPIC incorporated some, but not all, of the provisions of the Uniform Probate Code (UPC)—in fact, "[o]ne of the most important aspects of EPIC is that it is a true integration of the UPC while retaining unique and essential features of current Michigan law." *EPIC—New Probate and Trust Legislation for the New Millennium*, 79 Mich B J at 330. See also Payne, *Michigan Probate* (St. Paul: Thomson/West, 2017), § 1.2, p 3 ("[W]ithin 11 years [after adoption of the RPC], the Council of the Probate and Estate Planning Section of the State Bar began a review of the Code. One aim of the Council was to bring Michigan probate law closer to the [UPC]. The Council also wanted to amend the Code so that it would

3

The forfeiture provision was included in the RPC as part of a package of changes to the surviving-spouse provisions. In the Probate Code of 1939, a surviving spouse would split the intestate estate with the parents or children of the decedent.[9] With the passage of the RPC, however, a surviving spouse was permitted to take a much larger share of the estate. Under the RPC, the surviving spouse was permitted to take the first $60,000 and then split the remaining balance of the intestate estate.[10] At the same time the Legislature adopted this increased share, it adopted the forfeiture provision.

To determine the meaning of "willfully absent," we must turn to the dictionary.[11] *Webster's New Twentieth Century Dictionary* (2d unabridged ed) defines the adjective

---

better address current planning practice."). The forfeiture provision the Court examines today is unique to Michigan law. By contrast, the UPC provides that only those spouses who formally undergo a divorce or a termination of marital property rights are excluded from the surviving-spouse intestate share. UPC § 2-802 (2010). See also UPC § 2-802 (2010), comment (explaining that "[a]lthough some existing statutes bar the surviving spouse for desertion or adultery, the present section requires some definitive legal act to bar the surviving spouse").

[9] See 1939 PA 288, § 163 (providing, in part, that the surviving spouse would split the decedent's estate with the decedent's parents if the decedent had no children; if the decedent had children, then the surviving spouse would take a third of the decedent's estate and the children would be given the balance (or, if the decedent only had one child, the child and the surviving spouse would split the estate equally)).

[10] 1978 PA 642, § 105. EPIC has been amended to allow the surviving spouse to take the first $150,000, rather than $60,000, before splitting the balance of the estate. MCL 700.2102.

[11] See, e.g., *Krohn v Home-Owners Ins Co*, 490 Mich 145, 156; 802 NW2d 281 (2011) ("Unless statutorily defined, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used. We may consult dictionary definitions to give words their common and ordinary meaning.") (citations omitted). And since we are dealing with a provision of a statute that has not been changed since its original enactment, I believe we should use dictionaries from the time the provision was first enacted. See generally *Ronnisch Constr*

4

"absent" as "not present; not in company; away."[12]  Accordingly, when a spouse is "absent" he or she is "not present" or "away," making the critical aspect of "absent" the lack of physical presence.[13]

As the majority recognizes, the term "absent" is also defined as "heedless; inattentive to persons present or to subjects of conversation in company."[14]  This may be true, but when a word has more than one definition, the context determines the sense in which the Legislature used the word.[15]  Considered properly, the definition on which the

_Group, Inc v Lofts on the Nine, LLC_, 499 Mich 544, 563 n 58; 886 NW2d 113 (2016).  In any case, there are no meaningful differences between these definitions and those provided by more modern dictionaries, as will be shown below.

[12] _Webster's New Twentieth Century Dictionary_ (2d unabridged ed).

[13] This idea—that physical presence is the critical aspect of "absent"—comports with the primary historical sense of the word, see Slotkin, _Absent 'Without': Adjective, Participle, or Preposition_, 60 American Speech 222, 222 (Autumn, 1985) ("Historically, _absent_ has functioned primarily as an adjective synonymous with _missing_ or, with stress shift, a reflexive transitive verb with the meaning of 'be away'."), and a definition reflecting this sense of the word is present in every dictionary I was able to locate.  See _The Random House Dictionary of the English Language_ (unabridged ed, 1969) ("1. not in a certain place at a given time; away; missing; not present.  2. lacking; nonexistent."); _Webster's New Collegiate Dictionary_ (1974) ("1. not present or attending : MISSING.  2. not existing : LACKING . . . ."); _The Oxford English Dictionary_ (2d ed) ("1. being away, withdrawn from, or not present (at a place).  2. of things: withdrawn; wanting; not existing."); _Merriam-Webster's Collegiate Dictionary_ (11th ed) ("1: not present or attending : MISSING  2: not existing : LACKING . . . ."); _The American Heritage Dictionary of the English Language_ (new college ed, 1981) ("1. Missing or not present.  2. Not existent; lacking."); _Random House Webster's College Dictionary_ (2001) ("not in a certain place at a given time; away; missing; not present . . . .").

[14] _Webster's New Twentieth Century Dictionary_ (2d unabridged ed).

[15] See Scalia & Garner, _Reading Law: The Interpretation of Legal Texts_ (St. Paul: Thomson/West, 2012), p 70 ("Most common English words have a number of dictionary definitions, some of them quite abstruse and rarely intended.  One should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise.").

majority relies does not fit the context of this provision, which requires a spouse to be "absent" for a year or more.[16]  It would make little sense to say—or think the Legislature was requiring—that a spouse was "preoccupied" or "lost in thought" for a year or more, much less that the person remained in such a state "willfully."  And combining this definition with "physical absence" only makes matters worse.  Now the spouse must be both physically absent and "lost in thought"?  In short, the definition of absent on which the majority purports to rely has no workable meaning in the statutory context.  Instead, being *physically* absent is clearly "the most contextually appropriate" definition.[17]

---

Therefore, when interpreting a statutory term, we typically choose and apply the most contextually appropriate definition.  *Spectrum Health Hosps v Farm Bureau Mut Ins Co of Mich*, 492 Mich 503, 513; 821 NW2d 117 (2012) (" 'Unless statutorily defined, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used.' ") (citation omitted).

[16] See note 26 of this opinion and accompanying text.

[17] See *Reading Law*, p 70 and note 15 of this opinion.  Moreover, as the Court of Appeals recognized in *In re Peterson Estate*, 315 Mich App 423, 432; 889 NW2d 753 (2016), the definition of "absent" focusing on emotional inattentiveness does not fit in the present context for another reason: "Here, the statute refers to someone who 'did' certain acts, including being 'willfully absent,' deserting, or willfully neglecting or refusing to support the decedent spouse for '1 year or more' before the deceased spouse's death.  See MCL 700.2801(2)(e).  This context suggests physical separation."

Finally, in addition to being inapt, I agree with the Court of Appeals' conclusion in *In re Harris Estate*, 151 Mich App 780, 785; 391 NW2d 487 (1986), that this definition, focusing on emotions, is unworkable: "[s]ince all of us are subject to inattentiveness, whether willful or not, at some time or another, such an interpretation of absent would render the statute so broad in application as to put in jeopardy every surviving spouse's right to election under the Revised Probate Code."  Moreover, how could courts even begin to measure inattentiveness?  That seems like a question better left to a psychologist than a judge.  And, even if it could be measured, how inattentive must one be?  I fail to see how this alternative definition could be meaningfully applied.

6

Furthermore, no matter how hard one looks, it is clear that the definition the majority relies on—"inattentiveness"—does not even yield the majority's notion of "complete . . . emotional absence."[18]  Rather, this definition of "absent" refers to a state of mental distraction, not emotional absence.[19]  The dictionaries phrase this definition in slightly different ways: "not attentive; preoccupied; absent-minded,"[20] "inattentive, preoccupied,"[21] "lost in thought: not attentive,"[22] "not attentive; preoccupied; absent-minded,"[23] "[a]bsent-minded; paying no attention to, and receiving no impression from, present objects or events."[24]  But none of these permutations involves an emotional aspect.  Indeed, one could be inattentive to many different things—e.g., hygiene, finances, responding promptly—without being emotionally absent.  And it would seem that one could be "emotionally absent" (as the majority uses that term) without being inattentive in any of these ways, or in general.  Despite the majority's attempts to tease a

---

[18] And notably, neither party in this case, nor the Court of Appeals, asserted that one can read "emotional absence" into the definition of "inattentive" and thereby incorporate it into "willfully absent," as the majority does here.  This innovation, it would seem, is the majority's alone.

[19] This is true of the other definitions of "inattentiveness" discussed below.  See note 26 of this opinion (defining "inattentive").

[20] *The Random House Dictionary of the English Language* (unabridged ed, 1969).

[21] *Webster's New Collegiate Dictionary* (1974).

[22] *Merriam-Webster's Collegiate Dictionary* (11th ed).

[23] *Random House Webster's College Dictionary* (2001).

[24] *The Oxford English Dictionary* (2d ed).

connotation of emotional absence out of "inattentiveness," it is clear that the dictionary definitions simply will not cooperate.

Even so, the majority does not cite, and I have been unable to find, a dictionary that combines emotional inattentiveness and physical absence into a single definition, as the majority does here. Instead, as the majority acknowledges,[25] these definitions of "absent" are listed as separate alternatives: there is no definition that requires both physical and emotional absence.[26] By knitting together these disparate definitions, the majority creates its own definition, effectively choosing "all of the above," instead of choosing the contextually appropriate meaning.[27]

---

[25] See *ante* at 8.

[26] Nor, logically, could there be since one definition requires a person to be *physically absent*, i.e., "not present; not in company; away," while the other, as it pertains to human interaction, requires in its ordinary usage a person to be *physically present*, i.e., "inattentive to persons *present* or to subjects of conversation *in company*." *Webster's New Twentieth Century Dictionary* (2d unabridged ed) (emphasis added). See also *Webster's New Twentieth Century Dictionary* (2d unabridged ed) (defining "inattentive" as "not attentive; heedless; careless; negligent; as, an *inattentive* spectator or hearer"). This makes sense—we do not think of someone who is physically absent as also not fixing or applying the mind steadily. Instead, "inattentive" refers to someone who is physically present but "showing a lack of attention." See *The American Heritage Dictionary of the English Language* (new college ed, 1981), p 663. These two definitions of "absent"—physically missing and mentally distracted—thus, are not complementary aspects of a singular definition; they are two logically inconsistent alternative definitions, of which we must "choose and apply the most contextually appropriate." See *Reading Law*, p 70, and note 15 of this opinion.

[27] The majority is conflicted regarding how to treat the dictionary: is it the "first point of reference," *ante* at 6, or simply "one data point . . . [that] guides our analysis, but it does not by itself settle it," *ante* at 18? The latter characterization, it seems to me, is just another way of saying that the majority does not like the answer that the dictionary provides. There are many ways that "an uncritical approach to dictionaries can mislead judges . . . ." *Reading Law*, p 415 (discussing the use of "unreliable" and "threadbare"

8

Next, we must consider whether the statute has an intent requirement. As an initial matter, I am in agreement with the majority (and the Court of Appeals in *In re Peterson*) when it states that the statute does not require proof of an intent to abandon one's marital rights before an individual can be barred from inheriting under the provision.[28] But the statute does require that the absence be "willful." In ordinary use,

definitions). Not surprisingly, definition-shopping is high on the list. See *id*. at 418 (stating, as a "primary principle[] . . . in using dictionaries," that "[b]ecause common words typically have more than one meaning, you must use the context in which a given word appears to determine its aptest, most likely sense"). Instead of locating the aptest definition in this context, the majority rewrites the statute by creating a third definition more to its liking—one that is unknown to any dictionary.

[28] See *ante* at 22. I do not agree with the majority, however, when it seems to say the complete opposite. See *ante* at 13 ("These provisions all describe a situation in which, in effect, a spouse has initiated conduct that results in the complete dissolution of his or her marriage, either in fact or in practice."); *ante* at 13-14 ("[W]illful absence requires consideration of the totality of the circumstances. It presents a factual question for the trial court to answer: whether a spouse's complete absence brought about a practical end to the marriage."); *ante* at 14 n 9 ("[T]he trial court should ascertain whether that spouse has been *completely* absent from the spouse, both emotionally and physically."); *ante* at 18 (defining "absent" as "complete physical and emotional absence" and stating that the statutory scheme "contemplates that one only loses his or her status as a 'surviving spouse' if he or she takes action that is akin to a complete repudiation of the marriage"); *ante* at 24 ("[C]ourts should evaluate whether complete physical and emotional absence existed, resulting in an end to the marriage for practical purposes."). Under the majority's view, it seems that the spouse must initiate conduct that he or she knows would result in the termination of the marriage, and the spouse must be successful in doing so. That sounds an awful lot like intent. The majority's interpretation twists like a pretzel here as well.

Finally, it is worth noting that the majority's newfangled legal concept of a "practical" end to a marriage is vague and unsupported. It appears that the majority believes a marriage effectively ends, for these purposes, when there is a "complete" physical and emotional absence. Why must the absence be "complete"? And what can it possibly mean to be "completely" emotionally absent from someone? How will a court possibly make this determination?

9

"willful" is defined as "said or done deliberately or intentionally" or "following one's own will unreasoningly; obstinate; stubborn."[29] Linguistically, it does not make much sense to think of a person's absence from their spouse under EPIC in terms of whether the absence was "deliberate" or "intentional." No reasonable person would contend that an unintentional or involuntary separation—such as one resulting from a long-term medical condition, or being stranded on a deserted island—was what the Legislature was guarding against when it enacted this provision. To be "willful," then, as that term is commonly understood in the context of human interaction, is to make a decision on one's own, without regard to others.[30] A decision made with the consent of the other spouse is not a willful decision—that is, it is not a decision made "following one's own will unreasoningly."[31] Therefore, by using the phrase "*willfully* absent," the statute refers to a

---

[29] *Webster's New Twentieth Century Dictionary* (2d unabridged ed).

[30] See *Krohn*, 490 Mich at 156-157. The majority fails to recognize this alternative definition of "willful" or provide any rationale for its decision to give that term such a strained meaning in this context.

[31] See also *The Oxford English Dictionary* (2d ed) (defining "willful" as "[a]sserting or disposed to assert one's own will against persuasion, instruction, or command; governed by will without regard to reason; determined to take one's own way; obstinately self-willed or perverse"). Although we disagree on which definition applies, I agree with the majority that it does not matter whether the term "willful" is a term of art because the lay and legal dictionaries contain similar sets of definitions. See *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 621 n 62; 886 NW2d 135 (2016) ("If the definitions are the same in both a lay dictionary and legal dictionary, it is unnecessary to determine whether the phrase is a term of art, and it does not matter to which type of dictionary this Court resorts."). The legal dictionary at the time of the statute's drafting defined "willful" as having a unilateral component: "[i]ntractable; having a headstrong disposition to act by the rule of contradiction." *Black's Law Dictionary* (revised 4th ed).

10

spouse who is physically absent as a result of a unilateral decision by that spouse.[32] By contrast, spouses who live apart by mutual choice would be considered surviving spouses under the forfeiture provision because the absent spouse did not make a unilateral decision to be absent.[33]

The majority asserts that without an emotional-absence requirement, the "willfully absent" provision would be rendered a nullity by the desertion provision.[34] Although we concede that in many cases there is overlap between these two provisions, that is not always the case. Because "desertion" requires that someone have the intent to stay away, not every spouse who is "willfully absent" will also be guilty of "desertion."[35]

---

[32] While unnecessary to my interpretation, it is worth noting that my view is also consistent with the Reporter's Comments to RPC § 290, the statute from which MCL 700.2801(2)(e) was derived. The Reporter's Comments explain that "[MCL 700.2801(2)(e)] describes unilateral actions that are not approved or condoned by the decedent spouse before death." Martin & Harder, Estates and Protected Individuals Code with Reporters' Commentary (ICLE, 2018), p 154.

[33] Many divorce statutes that predated no-fault divorce legislation explained "desertion" by reference to a "willful absence." And one treatise from 1873 explains that, like our reading, to be granted a divorce due to "willful absence" a plaintiff must not have agreed to the absence—"because, if the plaintiff had consented to the absence, he would be barred on the ground of connivance[.]" 1 Bishop, *Commentaries on the Law of Marriage and Divorce* (5th ed), § 775, p 664.

[34] See *ante* at 10. As discussed above, in addition to excluding a "willfully absent" spouse, MCL 700.2801(2)(e) also excludes

> [a]n individual who . . . for 1 year or more before the death of the deceased person:
>
> * * *
>
> (*ii*) Deserted the decedent spouse.

[35] The word "desertion," whether read as a legal term of art or according to its ordinary

11

Conversely, while a spouse who has "deserted" the other will often be "willfully absent," there may be exceptions. For example, in the divorce context, our Court has recognized that a spouse may be guilty of desertion, not by leaving a spouse, but by mental or physical abuse that drives the other spouse away.[36] Under my reading, then, both statutory provisions—"willfully absent" and "desertion"—do independent work. For

use, includes as an element the intent not only to be physically absent, but to permanently abandon. See *Black's Law Dictionary* (10th ed) ("The willful and unjustified abandonment of a person's duties or obligations."). *Black's* explains further that, "[i]n family law, the five elements of spousal desertion are (1) a cessation of cohabitation, (2) the lapse of a statutory period, (3) an intention to abandon, (4) a lack of consent from the abandoned spouse, and (5) a lack of spousal misconduct that might justify the abandonment." *Id*. "Abandon," in turn, is defined as "[t]o desert or go away from permanently." See also *Webster's New Twentieth Century Dictionary* (2d unabridged ed) (defining "desert" as "to forsake; to leave in the lurch; to abandon; to quit with a view not to return to"). Cf. *The Random House Dictionary of the English Language* (1966) (defining "desert" as "to leave (a person, place, etc.) without intending to return, esp. in violation of a duty, promise, or the like; abandon; forsake"). This reflects our treatment of the term "desertion" in the divorce context, in which we held that desertion could not be found when the parties were considering whether to resume their status as husband and wife, i.e., when a spouse had not yet demonstrated an intent to permanently depart from the marriage. See *Rudd v Rudd*, 33 Mich 101, 102 (1875) (holding that proof the parties considered living together again "goes to negative the proposition that either party considered that matrimonial cohabitation was not to be resumed or continued," and for that reason, a bill for divorce based on desertion could not be maintained); see also *Rose v Rose*, 50 Mich 92, 92; 14 NW 711 (1883) ("To make out a case for the dissolution of marriage on this ground [i.e., desertion] there must be satisfactory proof of three things: *First*, cessation of cohabitation ; *second*, an intent in the mind of the defendant to desert [i.e., leave permanently] ; and, *third*, that the separation was against the will of the complainant.").

[36] See *Warner v Warner*, 54 Mich 492, 494-495; 20 NW 557 (1884) ("[A husband] as completely commits the crime of desertion when by his cruel conversation and conduct, he compels [his wife] for safety to leave him and his home, as when he willfully and without cause leaves and abandons her."); see also Bishop, § 791 (noting that a spouse can desert his or her spouse by engaging in "ill conduct" with the intent that the other spouse leave).

12

these reasons, I do not agree with the majority's statement that reading "absent" as meaning only physically absent renders the provision surplusage.

Lastly, instead of looking to the text and dictionary definitions, the majority divines its "complete" physical and emotional absence requirement through its interpretation of the statutory context, i.e., other provisions precluding someone from "surviving spouse" status. But all the majority really does is import perceived requirements from these other provisions into the definition of "willfully absent."[37] Moreover, the majority fails entirely to grapple with other surrounding provisions, such as MCL 700.2801(2)(d) (stating that a surviving spouse does not include "[a]n individual who, at the time of the decedent's death, is living in a bigamous relationship with another individual"), which target actions that do not necessarily reflect an intent to end the marriage. The majority's attempt to justify its departure from the plain language of MCL 700.2801(2)(e)(*i*) based upon the statutory context in which it appears is simply not persuasive.

---

[37] For example, the majority notes that MCL 700.2801(e)(*ii*) and (*iii*) each include requirements that "involve intentional acts that bring about a situation of divorce in practice . . . ." *Ante* at 12. Putting aside whether that is correct (and I doubt that it is), the majority does not grapple seriously with whether that same requirement pertains to MCL 700.2801(e)(*i*). The majority does not, for example, purport to apply any canon of interpretation, such as the associated-words canon, which holds that words associated by context "should be assigned a permissible meaning that makes them similar." *Reading Law*, p 195. In such cases, the "common quality suggested by a listing should be its most general quality—the least common denominator, so to speak—relevant to the context." *Id*. at 196. The majority's interpretation does not attempt to reflect the "most general quality" of the listed items. I fail to see how the majority's newly conceived "quality" of a complete physical and emotional absence leading to de facto divorce could have possibly been the "most general quality" the Legislature meant to capture with this list.

13

In sum, I conclude that the phrase "willfully absent" in the forfeiture provision, MCL 700.2801(2)(e)(*i*), refers to a person who is physically absent from the decedent spouse as a result of his or her unilateral decision. I also agree with the majority that the record in this case is sparse and believe that the majority's recitation of the few facts we know is accurate. Therefore, I would remand this case to the trial court so that it may determine in the first instance whether Maggie was physically absent as a result of her unilateral decision.[38]

Because I believe that the majority's interpretation is not in accordance with a plain-language reading of the statute, I respectfully dissent.

David F. Viviano
Bridget M. McCormack
Richard H. Bernstein

---

[38] On remand, I would direct the trial court to consider the length of time apart, the fact that James consented to a support order providing Maggie and their children with financial assistance, the statements in the 2010 complaint that Maggie and James filed in their joint suit against General Motors, and any other evidence bearing on this question.