# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Estate of LYLE SETH PETERSON.

RHONDA LOVETT,

　　　　　　　　Appellant,

v

ARBUTUS PETERSON,

　　　　　　　　Appellee.

FOR PUBLICATION
May 24, 2016
9:10 a.m.

No. 326017
Houghton Probate Court
LC No. 2012-024873-DE

Before: GLEICHER, P.J., and SAWYER and M. J. KELLY, JJ.

PER CURIAM.

In this dispute over the probate of Lyle Seth Peterson's estate, appellant, Rhonda Lovett, appeals by right, see MCL 600.861(a), the probate court's order denying her motion for a declaration that Lyle's widow, Arbutus Peterson, was not a surviving spouse because she was "willfully absent" from him for one year or more before his death. See MCL 700.2801(2)(e)(*i*). We conclude that the probate court did not clearly err when it found that Arbutus did not willfully absent herself from Lyle. Accordingly, we affirm.

## I. BASIC FACTS

Arbutus testified that she and Lyle married in 1959. In 1973, they purchased a store in Phoenix, Michigan, which is in Keewenaw County, and renovated it to include living quarters above the retail area. After the store and living space were ready in 1974, they occupied it as their marital home. Arbutus operated the store and Lyle worked for the federal park service until he retired in 1988 or 1989.

In the early 90s, Lyle began to have an extramarital affair with Susan Strieter. Testimony established that Lyle and Strieter took steps to keep the affair from being obvious, but it was still widely known. Arbutus testified that, even though she "never really came right out and asked him," she knew that Lyle was having an affair with Strieter. Lyle, however, refused to acknowledge the affair; he preferred that she not know where he was. Ron Lahti, who is the Keewenaw County Sheriff, testified that he had known Arbutus and Lyle for about 35 years, and stated that "it was no secret [that] Lyle had affairs." Lyle's daughter, Susan Gherna, likewise

-1-

testified that she knew "through the rumor mill" that her father was having an affair with Strieter. Even so, it was clear to her that her father "would have never told [her]" about Strieter, because "he didn't want us to know that part of his life."

Despite the affair, Arbutus did not treat Lyle any differently; she did not ask him to leave the marital home, she continued to cook for him, she did his laundry, she operated the store, and "never refused [him] anything." She also did not divorce him: "I was married and that is the way I stayed." She denied that she ever willfully refused to see Lyle or to perform whatever services he expected of her or asked from her as a wife. Lahti agreed that Arbutus did not change the way she treated Lyle even though he was having an affair. Gherna testified that her mother "might grumble a little bit," but she always did what she was expected to do for Lyle. In addition, Lyle never took steps to divorce Arbutus.

In 2006, Lyle moved into a cabin that he and Arbutus owned adjacent to the store. In October 2006, Lyle and Strieter went to see a lawyer to draft a will for Lyle. The lawyer drafted the will and Lyle executed it, but he went to a different lawyer in order to obtain a revised will. Lyle executed the revised will in November 2006. In the summer of 2007, Lyle moved into a home with Strieter. The home was in Lake Linden, Michigan, which is in Houghton County. Even after moving away, Lyle continued to visit the store and helped Arbutus with the store's maintenance. She also continued to cook him meals and interact with him on his visits.

Lyle apparently struggled with dementia at the end of his life and was at some point unable to drive. Others would drive him to the store for visits, but he eventually stopped going to the store. Arbutus testified that she last saw Lyle in 2009. Gherna testified that she continued to make an effort to see her father in his last years and last saw him in June 2011. She would go to Strieter's home and visit him while Strieter was at work. Arbutus, however, admitted that she did not make any effort to contact Lyle or visit him at Strieter's home. She stated that she did not bother Lyle because she was sure he would be uncomfortable with her doing so. Arbutus also stated that Strieter made no effort to update her about her husband's situation; Gherna would keep her informed about her husband.

Lyle died in September 2011. The probate court in Keewenaw County appointed Arbutus to be the personal representative of Lyle's estate and she sought to have his estate probated as an intestate estate. The probate court eventually transferred the case to Houghton County, because Lyle died while domiciled there. There was some dispute over the validity of the wills and, in January 2012, Arbutus gave notice that she might elect to take her spousal share depending on the outcome of the dispute. The probate court accepted Lyle's November 2006 will for probate in January 2013, and appointed Lyle's sister, Hazel Sutherland, to be the personal representative for his estate in April 2013. Arbutus gave formal notice of her decision to elect against the will in October 2014.

In December 2014, Lyle's daughter from a previous relationship, Rhonda Lovett, petitioned the probate court for a declaration that Arbutus was not a surviving spouse for purposes of the statute allowing a spousal election because she "[w]as willfully absent" from Lyle for one year or more before his death. See MCL 700.2801(2)(e)(i). The probate court held a hearing on the petition in January 2015. At the hearing, it considered various exhibits and heard the testimony summarized above. At the close of proofs, the probate court discussed this

Court's interpretation of the forfeiture provision from the now repealed Revised Probate Code, MCL 700.101 *et seq*. See *In re Harris Estate*, 151 Mich App 780; 391 NW2d 487 (1986) (interpreting MCL 700.290). Because the forfeiture provision from the Revised Probate Code had similar language to the forfeiture provision stated under MCL 700.2801(2)(e)(*i*) of the Estates and Protected Individuals Code, MCL 700.1101 *et seq*., the probate court applied the test from *In re Harris Estate* to the forfeiture provision at issue. Accordingly, it determined that Lovett had to show that Arbutus was physically absent from Lyle for one year or more and that she took some act that manifested an intent to give up her marital rights.

Turning to the facts, the court found that Arbutus did not do anything "that was unacceptable" concerning her husband's decision to live with Strieter; rather, she chose to honor her marital vows:

> That is her right to honor her vows and it's nobody else's right to look at her badly or any other way for that. We don't hear this. I see marriages entered into very loosely in this court and thrown away very quickly. And, all of us have seen that in our own families and our own friendships and I'm not here to talk about those folks, but here's a woman who, regardless of what anybody else does, took these vows seriously—incredibly seriously.

The court further opined that it was reasonable for Arbutus to avoid calling Lyle under the circumstances: "I can't imagine a spouse feeling that, oh, I'm gonna call my husband up at his mistress's. That makes absolutely no sense, whatsoever." Because there was "absolutely nothing in this record that would demonstrate that" Arbutus intended to give up her marital rights, the probate court denied Lovett's motion for a declaration that Arbutus was not a surviving spouse.

Lovett now appeals in this Court.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

Lovett argues on appeal that the probate court erred when, relying on the decision in *In re Harris Estate*, it required her to show that Arbutus had the specific intent to abandon her marital rights. She argues that the probate court should not have applied *In re Harris Estate* because this Court's discussion of intent in that case was merely dicta and, in any event, did not accurately reflect the language of the statute. This Court reviews de novo whether the probate court properly interpreted and applied the statute at issue. *Pransky v Falcon Gp*, 311 Mich App 164, 173; 874 NW2d 367 (2015). This Court, however, reviews for clear error the probate court's findings of fact. *In re Raymond Estate*, 483 Mich 48, 53; 764 NW2d 1 (2009) (plurality opinion), citing *In re Wojan Estate*, 126 Mich App 50; 337 NW2d 308 (1983), and *In re Burruss Estate*, 152 Mich App 660, 663-664, 394 NW2d 466 (1986).

## B. FORFEITING SPOUSAL RIGHTS

When a decedent who was domiciled in this state dies testate, his or her surviving spouse may elect to "abide by the terms of the will," or may elect to "take ½ of the sum or share that would have passed to the spouse had the testator died intestate, reduced by ½ of the value of all property derived by the spouse from the decedent by any means other than testate or intestate succession upon the decedent's death." MCL 700.2202(2). For purposes of these elections, the Legislature has provided that a "surviving spouse does not include," in relevant part:

(e) An individual who did any of the following for 1 year or more before the death of the deceased person:

(*i*) Was willfully absent from the decedent spouse.

(*ii*) Deserted the decedent spouse.

(*iii*) Willfully neglected or refused to provide support for the decedent spouse if required to do so by law. [MCL 700.2801(2).][1]

In determining what constitutes being "willfully absent from the decedent spouse" under MCL 700.2801(2)(e)(*i*), the probate court relied on this Court's decision in *In re Harris Estate*. In that case, this Court had to determine whether the probate court properly interpreted and applied MCL 700.290(1)(a) of the Revised Probate Code, which was the predecessor to MCL 700.2801(2)(e). *In re Harris Estate*, 151 Mich App at 783. That statute provided: "A surviving spouse does not have a right of election against the will of a deceased spouse . . . if the surviving spouse . . . for 1 year or more previous to the death of the deceased spouse" was "willfully absent from the decedent spouse." MCL 700.290(1)(a). On appeal, the personal representative argued that the trial court erred by requiring proof of physical separation because a "surviving spouse's emotional absence or desertion" was "sufficient to extinguish" the right to elect against the will under MCL 700.290. *In re Harris Estate*, 151 Mich App at 783-784.

This Court examined the statute and concluded that it would be absurd to interpret the statute to encompass emotional separation: "Since all of us are subject to inattentiveness, whether wilful or not, at some time or another, such an interpretation of absent would render the statute so broad in application as to put in jeopardy every surviving spouse's right to election under the Revised Probate Code." *Id.* at 785. The Court, therefore, determined that to be "absent" referred to physical separation and held that the separation must have been continuous for at least the year preceding the deceased spouse's death. *Id.* at 785-786. Having clarified the proper construction of the statute, the Court went further and stated that, because forfeitures were disfavored in the law, it would construe MCL 700.290 "as showing an intent by the Legislature that a spouse must intend to give up his rights in the marriage before such can be lost." *Id.* at

---

[1] The Legislature amended this statute effective June 27, 2016. See 2016 PA 57. However, the amendment does not implicate the provisions at issue here.

786. "The requisite intent," the Court explained, can be "shown by actions indicating a conscious decision to permanently no longer be involved in the marriage." *Id.* at 787.

We agree with this Court's conclusion in *In re Harris Estate* that the phrase "[w]as willfully absent," as used in MCL 700.2801(2)(e)(i), refers to physical absence.[2] The word absent ordinarily refers to being physically away. See *The Oxford English Dictionary* (2d ed, 1991) (defining the adjective 'absent' as "[b]eing away, withdrawn from, or not present (at a place)", and defining the verb 'absent,' in relevant part, to mean "[t]o be or stay away; to withdraw"). Undoubtedly, the term absent can be used in ordinary speech to refer to mental or emotional absence; a person who is physically absent generally does not provide emotional support, and so, figuratively speaking, one may refer to a person who does not provide emotional support as being emotionally "absent." However, whether the term is used in this way, rather than in the ordinary sense, will normally follow from the context. And, in the absence of context indicating such use, we will give the term its ordinary meaning. Here, the statute refers to someone who "did" certain acts, including being "willfully absent," deserting, or willfully neglecting or refusing to support the decedent spouse for "1 year or more" before the deceased spouse's death. See MCL 700.2801(2)(e). This context suggests physical separation. See *Hayes v Parole Bd*, 312 Mich App 774, ___; ___ NW2d ___ (2015). We also agree that the physical separation must be continuous because the Legislature provided that the individual must have done "any of the following *for* 1 year or more . . . ." MCL 700.2802(2)(e) (emphasis added). The preposition "for" establishes that the phrase refers to a continuous span of time.

We do not, however, agree that the statute requires proof of intent to abandon one's marital rights. The majority in *In re Harris Estate* held that a surviving spouse cannot forfeit his or her marital rights in the absence of evidence that the surviving spouse took acts "indicating a conscious decision to permanently no longer be involved in the marriage." *In re Harris Estate*, 151 Mich App at 787. The Legislature provided that an individual will not be deemed a surviving spouse if he or she "[w]as willfully absent from the decedent spouse." MCL 700.2802(2)(e)(*i*). The Legislature's use of the term "willfully" established the requisite intent that the individual must have in order to be disqualified as a surviving spouse: the individual must have acted with the specific intent to bring about the particular result addressed in the statute. See *In re Napieraj*, 304 Mich App 742, 745-746; 848 NW2d 499 (2014). Specifically, in order for an individual to be "willfully absent" within the meaning of MCL 700.2802(2)(e)(*i*), the individual must have done something with the intent to bring about his or her absence from the deceased spouse. Consequently, we agree with Lovett's contention that the probate court erred when it determined that she had to show that Arbutus intended to give up her marital rights before MCL 700.2802(2)(e)(*i*) would apply. The Legislature did not include such a requirement and we are not at liberty to read one into the statute. *Pransky*, 311 Mich App at 186-187.

---

[2] We recognize that we are not bound by the decision in *In re Harris Estate*. See MCR 7.215(J)(1).

Lovett argued before the probate court that Arbutus' failure to make an effort to contact Lyle, visit Lyle, or otherwise be a part of his life is evidence that she was willfully absent from him. She similarly argues that the statute does not preclude the possibility that both spouses might be willfully absent from each other. We agree that both spouses can be willfully absent from each other, but we do not agree that the Legislature intended to require a deserted or abandoned spouse to make a continuous effort to restore cohabitation or maintain the marital relationship or risk being deemed to be "willfully absent" from his or her spouse within the meaning of MCL 700.2801(2)(e)(*i*). The Legislature stated that an individual "who did" certain acts would not be deemed a surviving spouse. MCL 700.2801(2)(e). The word "did" suggests acts rather than omissions. Similarly, the word "willfully" in the phrase "[w]as willfully absent" indicates that the individual must act or fail to act with the intent to bring about a specific result—in this context, to bring about physical separation from his or her spouse. Thus, even accepting that a spouse can deliberately fail to act with the required intent, we conclude that mere omissions do not amount to being "willfully absent" unless the failure to act caused the continued separation. MCL 700.2801(2)(e)(*i*).

In this case, there is no evidence that Arbutus took some act or failed to act with the intent to cause her physical separation from Lyle—that is, there was no evidence that she "[w]as willfully absent" from him during the year preceding his death. MCL 700.2801(2)(e)(*i*). There is no evidence that she forced Lyle from the marital home or that she removed herself from his presence. All the evidence showed that Lyle absented himself from Arbutus and that Arbutus remained faithful to the marriage. She continued to interact with Lyle when he came around the store, she prepared him meals, operated the store, and used her own funds to maintain the marital property. As Lahti testified at the hearing, Arbutus was always there for Lyle:

> [S]he stayed right where she's been for the last fifty years, doing what she'd done for the last fifty years. Lyle is the one that left. You know, I don't know what went on between them, at that point, but I do know that she always knew what Lyle was up to. And even at one point we discussed it that if he was there she would take care of him.

It is true that the evidence demonstrated that Arbutus did not contact or visit Lyle during the last year of his life, but it was also undisputed that she did not do so because Lyle did not want her involved with his extra-marital life. Nothing within the statute requires an innocent spouse to repeatedly attempt to reconcile or maintain physical proximity to his or her spouse against his or her spouse's wishes.

Although there was evidence that Lyle and Arbutus were physically separated for one year or more before his death, the evidence amply demonstrated that Lyle left the marital home and that he alone caused the continued separation. While Arbutus may have acquiesced to the separation, her decision to acquiesce to Lyle's wishes was not sufficient to establish that she "[w]as willfully absent" from Lyle within the meaning of MCL 700.2801(2)(e)(*i*). Given the undisputed evidence, the trial court's imposition of an erroneous intent requirement does not warrant relief. MCR 2.613(A); MCR 5.001(A).

## III. CONCLUSION

The probate court erred when it construed MCL 700.2801(2)(e)(*i*) to require proof that a spouse intended to give up his or her marital rights before he or she will be deemed not to be a surviving spouse under that statute. Nevertheless, because the undisputed evidence showed that Arbutus did not willfully cause her absence from Lyle, the error does not warrant relief. MCR 2.613(A).

Affirmed. As the prevailing party, Arbutus may tax her costs. MCR 7.219(A).

/s/ Elizabeth L. Gleicher
/s/ David H. Sawyer
/s/ Michael J. Kelly