Viviano, J. (dissenting).
 

 The majority today holds "that an individual is not a surviving spouse for the purposes of MCL 700.2801(2)(e)(
 
 i
 
 ) if he or she intended to be absent from his or her spouse for the year or more leading up to the spouse's death."
 
 [1]
 
 Further, the majority states that "[a]bsence in this context presents a factual inquiry based on the totality of the circumstances, and courts should evaluate whether
 
 complete physical and emotional absence existed, resulting in an end to the marriage for practical purposes
 
 ."
 
 [2]
 
 Because I conclude that the "willfully absent" provision in the forfeiture statute, MCL 700.2801(2)(e)(
 
 i
 
 ), by its plain language, refers to a person who is physically absent
 from the decedent spouse as a result of his or her unilateral decision, I dissent.
 

 James Erwin, Sr., died intestate and, consequently, MCL 700.2101(1) of the Estates and Protected Individuals Code (EPIC)
 
 [3]
 
 controls the disposition of his estate. Under EPIC, a surviving spouse is entitled to an intestate share from his or her decedent spouse's estate.
 
 [4]
 
 Appellee Maggie Erwin seeks to collect, as James's surviving spouse, this share from James's estate. Appellant Beatrice King challenges Maggie's status as a surviving spouse under EPIC's forfeiture provision, MCL 700.2801, alleging that Maggie "[w]as willfully absent from the decedent spouse"
 
 [5]
 
 and therefore cannot take the surviving-spouse share. Thus, this case turns on the proper meaning of "willfully absent."
 

 The statute, in relevant part, lists three situations in which a "surviving spouse" forfeits his or her entitlement to collect the intestate share:
 

 An individual who did any of the following for 1 year or more before the death of the deceased person:
 

 (
 
 i
 
 ) Was willfully absent from the decedent spouse.
 

 (
 
 ii
 
 ) Deserted the decedent spouse.
 

 (
 
 iii
 
 ) Willfully neglected or refused to provide support for the decedent spouse if required to do so by law.
 
 [
 

 6
 

 ]
 

 This provision was first added as part of the Revised Probate Code (RPC), which was enacted in 1978.
 
 [7]
 
 When
 the RPC was later replaced by EPIC in 2000, the forfeiture provision remained substantively unchanged.
 
 [8]
 

 The forfeiture provision was included in the RPC as part of a package of changes to the surviving-spouse provisions. In the Probate Code of 1939, a surviving spouse would split the intestate estate with the parents or children of the decedent.
 
 [9]
 
 With the passage of the RPC, however, a surviving spouse was permitted to take a much larger share of the estate. Under the RPC, the surviving spouse was permitted to take the first $60,000 and then split the remaining balance of the intestate estate.
 
 [10]
 
 At the same time the Legislature
 adopted this increased share, it adopted the forfeiture provision.
 

 To determine the meaning of "willfully absent," we must turn to the dictionary.
 
 [11]
 

 Webster's New Twentieth Century Dictionary
 
 (2d unabridged ed.) defines the adjective "absent" as "not present; not in company; away."
 
 [12]
 
 Accordingly, when a spouse is "absent" he or she is "not present" or "away," making the critical aspect of "absent" the lack of physical presence.
 
 [13]
 

 As the majority recognizes, the term "absent" is also defined as "heedless; inattentive to persons present or to subjects of conversation in company."
 
 [14]
 
 This may be true, but when a word has more than one definition, the context determines the sense in which the Legislature used the word.
 
 [15]
 
 Considered properly, the definition on which the majority relies does not fit the context of this provision, which requires a spouse to be "absent" for a year or more.
 
 [16]
 
 It would make little sense to say-or think the Legislature was requiring-that a spouse was "preoccupied" or "lost in thought" for a year or more, much less that the person remained in such a state "willfully." And combining this definition with "physical absence" only makes matters worse. Now the spouse must be both physically absent and "lost in thought"? In short, the definition of absent on which the majority purports to rely has no workable meaning in the statutory context. Instead, being
 
 physically
 
 absent is clearly "the most contextually appropriate" definition.
 
 [17]
 

 Furthermore, no matter how hard one looks, it is clear that the definition the majority relies on-"inattentiveness"-does not even yield the majority's notion of "complete ... emotional absence."
 
 [18]
 
 Rather, this definition of "absent" refers to a state of mental distraction, not emotional absence.
 
 [19]
 
 The dictionaries phrase this definition in slightly different ways: "not attentive; preoccupied; absent-minded,"
 
 [20]
 
 "inattentive, preoccupied,"
 
 [21]
 
 "lost in thought: not attentive,"
 
 [22]
 
 "not attentive; preoccupied; absent-minded,"
 
 [23]
 
 "[a]bsent-minded; paying no attention to, and receiving no impression
 from, present objects or events."
 
 [24]
 
 But none of these permutations involves an emotional aspect. Indeed, one could be inattentive to many different things-e.g., hygiene, finances, responding promptly-without being emotionally absent. And it would seem that one could be "emotionally absent" (as the majority uses that term) without being inattentive in any of these ways, or in general. Despite the majority's attempts to tease a connotation of emotional absence out of "inattentiveness," it is clear that the dictionary definitions simply will not cooperate.
 

 Even so, the majority does not cite, and I have been unable to find, a dictionary that combines emotional inattentiveness and physical absence into a single definition, as the majority does here. Instead, as the majority acknowledges,
 
 [25]
 
 these definitions of "absent" are listed as separate alternatives: there is no definition that requires both physical and emotional absence.
 
 [26]
 
 By knitting together these disparate
 definitions, the majority creates its own definition,
 effectively choosing "all of the above," instead of choosing the contextually appropriate meaning.
 
 [27]
 

 Next, we must consider whether the statute has an intent requirement. As an initial matter, I am in agreement with the majority (and the Court of Appeals in
 
 In re Peterson
 
 ) when it states that the statute does not require proof of an intent to abandon one's marital rights before an individual can be barred from inheriting under the provision.
 
 [28]
 
 But the statute does require
 that the absence be "willful." In ordinary use, "willful" is defined as "said or done deliberately or intentionally" or "following one's own will unreasoningly; obstinate; stubborn."
 
 [29]
 
 Linguistically, it
 does not make much sense to think of a person's absence from their spouse under EPIC in terms of whether the absence was "deliberate" or "intentional." No reasonable person would contend that an unintentional or involuntary separation-such as one resulting from a long-term medical condition, or being stranded on a deserted island-was what the Legislature was guarding against when it enacted this provision. To be "willful," then, as that term is commonly understood in the context of human interaction, is to make a decision on one's own, without regard to others.
 
 [30]
 
 A decision made with the consent of the other spouse is not a willful decision-that is, it is not a decision made "following one's own will unreasoningly."
 
 [31]
 
 Therefore,
 by using the phrase "
 
 willfully
 
 absent," the statute refers to a spouse who is physically absent as a result of a unilateral decision by that spouse.
 
 [32]
 
 By contrast, spouses who live apart by mutual choice would be considered surviving spouses under the forfeiture provision because the absent spouse did not make a unilateral decision to be absent.
 
 [33]
 

 The majority asserts that without an emotional-absence requirement, the "willfully absent" provision would be rendered a nullity by the desertion provision.
 
 [34]
 
 Although we concede that in many cases there is overlap between these two provisions, that is not always the case. Because "desertion" requires that
 someone have the intent to stay away, not every spouse who is "willfully absent" will also be guilty of "desertion."
 
 [35]
 
 Conversely, while a
 spouse who has "deserted" the other will often be "willfully absent," there may be exceptions. For example, in the divorce context, our Court has recognized that a spouse may be guilty of
 desertion, not by leaving a spouse, but by mental or physical abuse that drives the other spouse away.
 
 [36]
 
 Under my reading, then, both statutory provisions-"willfully absent" and "desertion"-do independent work. For these reasons, I do not agree with the majority's statement that reading "absent" as meaning only physically absent renders the provision surplusage.
 

 Lastly, instead of looking to the text and dictionary definitions, the majority divines its "complete" physical and emotional absence requirement through its interpretation of the statutory context, i.e., other provisions precluding someone from "surviving spouse" status. But all the majority really does is import perceived requirements from these other provisions into the definition of "willfully absent."
 
 [37]
 
 Moreover,
 the majority fails entirely to grapple with other surrounding provisions, such as MCL 700.2801(2)(d) (stating that a
 surviving spouse does not include "[a]n individual who, at the time of the decedent's death, is living in a bigamous relationship with another individual"), which target actions that do not necessarily reflect an intent to end the marriage. The majority's attempt to justify its departure from the plain language of MCL 700.2801(2)(e)(
 
 i
 
 ) based upon the statutory context in which it appears is simply not persuasive.
 

 In sum, I conclude that the phrase "willfully absent" in the forfeiture provision, MCL 700.2801(2)(e)(
 
 i
 
 ), refers to a person who is physically absent from the decedent spouse as a result of his or her unilateral decision. I also agree with the majority that the record in this case is sparse and believe that the majority's recitation of the few facts we know is accurate. Therefore, I would remand this case to the trial court so that it may determine in the first instance whether Maggie was physically absent as a result of her unilateral decision.
 
 [38]
 

 Because I believe that the majority's interpretation is not in accordance with a plain-language reading of the statute, I respectfully dissent.
 

 Bridget M. McCormack, Richard H. Bernstein, JJ., agrees.
 

 Ante
 
 at ----.
 

 Ante
 
 at ---- (emphasis added). I do not understand why the majority frames this issue as a "factual inquiry" when the interpretation of a statute is a purely legal question. See, e.g.,
 
 Koontz v. Ameritech Servs. Inc.
 
 ,
 
 466 Mich. 304
 
 , 309,
 
 645 N.W.2d 34
 
 (2002) ("Issues of statutory interpretation are questions of law that we review de novo."). The majority appears to be putting the cart before the horse.
 

 MCL 700.1101
 
 et seq
 
 .
 

 MCL 700.2102.
 

 MCL 700.2801(e)(
 
 i
 
 ).
 

 MCL 700.2801(2)(e).
 

 1978 PA 642
 
 , § 290; see also Lowe,
 
 EPIC-New Probate and Trust Legislation for the New Millennium
 
 , 79 Mich. B J 330 (2000) ; see also V Michigan Compiled Laws of 1979, § 700.141 (stating that the statute was "[n]ew 1978, p. 2470, Act 642, Eff. July 1, 1979").
 

 1998 PA 386
 
 , § 2801(2)(e)(
 
 ii
 
 ), effective Apr 1, 2000. The RPC and EPIC incorporated some, but not all, of the provisions of the Uniform Probate Code (UPC)-in fact, "[o]ne of the most important aspects of EPIC is that it is a true integration of the UPC while retaining unique and essential features of current Michigan law."
 
 EPIC-New Probate and Trust Legislation for the New Millennium
 
 , 79 Mich. B J at 330. See also Payne,
 
 Michigan Probate
 
 (St. Paul: Thomson/West, 2017), § 1.2, p. 3 ("[W]ithin 11 years [after adoption of the RPC], the Council of the Probate and Estate Planning Section of the State Bar began a review of the Code. One aim of the Council was to bring Michigan probate law closer to the [UPC]. The Council also wanted to amend the Code so that it would better address current planning practice."). The forfeiture provision the Court examines today is unique to Michigan law. By contrast, the UPC provides that only those spouses who formally undergo a divorce or a termination of marital property rights are excluded from the surviving-spouse intestate share. UPC § 2-802 (2010). See also UPC § 2-802 (2010), comment (explaining that "[a]lthough some existing statutes bar the surviving spouse for desertion or adultery, the present section requires some definitive legal act to bar the surviving spouse").
 

 See
 
 1939 PA 288
 
 , § 163 (providing, in part, that the surviving spouse would split the decedent's estate with the decedent's parents if the decedent had no children; if the decedent had children, then the surviving spouse would take a third of the decedent's estate and the children would be given the balance (or, if the decedent only had one child, the child and the surviving spouse would split the estate equally) ).
 

 1978 PA 642
 
 , § 105. EPIC has been amended to allow the surviving spouse to take the first $150,000, rather than $60,000, before splitting the balance of the estate. MCL 700.2102.
 

 See, e.g.,
 
 Krohn v. Home-Owners Ins Co
 
 ,
 
 490 Mich. 145
 
 , 156,
 
 802 N.W.2d 281
 
 (2011) ("Unless statutorily defined, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used. We may consult dictionary definitions to give words their common and ordinary meaning.") (citations omitted). And since we are dealing with a provision of a statute that has not been changed since its original enactment, I believe we should use dictionaries from the time the provision was first enacted. See generally
 
 Ronnisch Constr.Group, Inc. v. Lofts on the Nine, LLC
 
 ,
 
 499 Mich. 544
 
 , 563 n. 58,
 
 886 N.W.2d 113
 
 (2016). In any case, there are no meaningful differences between these definitions and those provided by more modern dictionaries, as will be shown below.
 

 Webster's New Twentieth Century Dictionary
 
 (2d unabridged ed.).
 

 This idea-that physical presence is the critical aspect of "absent"-comports with the primary historical sense of the word, see Slotkin,
 
 Absent 'Without': Adjective, Participle, or Preposition
 
 , 60 American Speech 222, 222 (Autumn, 1985) ("Historically,
 
 absent
 
 has functioned primarily as an adjective synonymous with
 
 missing
 
 or, with stress shift, a reflexive transitive verb with the meaning of 'be away'."), and a definition reflecting this sense of the word is present in every dictionary I was able to locate. See
 
 The Random House Dictionary of the English Language
 
 (unabridged ed, 1969) ("1. not in a certain place at a given time; away; missing; not present. 2. lacking; nonexistent.");
 
 Webster's New Collegiate Dictionary
 
 (1974) ("1. not present or attending : MISSING. 2. not existing : LACKING ....");
 
 The Oxford English Dictionary
 
 (2d ed.) ("1. being away, withdrawn from, or not present (at a place). 2. of things: withdrawn; wanting; not existing.");
 
 Merriam-Webster's Collegiate Dictionary
 
 (11th ed.) ("1: not present or attending : MISSING 2: not existing : LACKING ....");
 
 The American Heritage Dictionary of the English Language
 
 (new college ed, 1981) ("1. Missing or not present. 2. Not existent; lacking.");
 
 Random House Webster's College Dictionary
 
 (2001) ("not in a certain place at a given time; away; missing; not present ....").
 

 Webster's New Twentieth Century Dictionary
 
 (2d unabridged ed.).
 

 See Scalia & Garner,
 
 Reading Law: The Interpretation of Legal Texts
 
 (St. Paul: Thomson/West, 2012), p. 70 ("Most common English words have a number of dictionary definitions, some of them quite abstruse and rarely intended. One should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise."). Therefore, when interpreting a statutory term, we typically choose and apply the most contextually appropriate definition.
 
 Spectrum Health Hosps v. Farm Bureau Mut Ins Co of Mich.
 
 ,
 
 492 Mich. 503
 
 , 513,
 
 821 N.W.2d 117
 
 (2012) (" 'Unless statutorily defined, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used.' ") (citation omitted).
 

 See note 26 of this opinion and accompanying text.
 

 See
 
 Reading Law
 
 , p. 70 and note 15 of this opinion. Moreover, as the Court of Appeals recognized in
 
 In re Peterson Estate
 
 ,
 
 315 Mich.App. 423
 
 , 432,
 
 889 N.W.2d 753
 
 (2016), the definition of "absent" focusing on emotional inattentiveness does not fit in the present context for another reason: "Here, the statute refers to someone who 'did' certain acts, including being 'willfully absent,' deserting, or willfully neglecting or refusing to support the decedent spouse for '1 year or more' before the deceased spouse's death. See MCL 700.2801(2)(e). This context suggests physical separation."
 

 Finally, in addition to being inapt, I agree with the Court of Appeals' conclusion in
 
 In re Harris Estate
 
 ,
 
 151 Mich.App. 780
 
 , 785,
 
 391 N.W.2d 487
 
 (1986), that this definition, focusing on emotions, is unworkable: "[s]ince all of us are subject to inattentiveness, whether willful or not, at some time or another, such an interpretation of absent would render the statute so broad in application as to put in jeopardy every surviving spouse's right to election under the Revised Probate Code." Moreover, how could courts even begin to measure inattentiveness? That seems like a question better left to a psychologist than a judge. And, even if it could be measured, how inattentive must one be? I fail to see how this alternative definition could be meaningfully applied.
 

 And notably, neither party in this case, nor the Court of Appeals, asserted that one can read "emotional absence" into the definition of "inattentive" and thereby incorporate it into "willfully absent," as the majority does here. This innovation, it would seem, is the majority's alone.
 

 This is true of the other definitions of "inattentiveness" discussed below. See note 26 of this opinion (defining "inattentive").
 

 The Random House Dictionary of the English Language
 
 (unabridged ed, 1969).
 

 Webster's New Collegiate Dictionary
 
 (1974).
 

 Merriam-Webster's Collegiate Dictionary
 
 (11th ed.).
 

 Random House Webster's College Dictionary
 
 (2001).
 

 The Oxford English Dictionary
 
 (2d ed.).
 

 See
 
 ante
 
 at ----.
 

 Nor, logically, could there be since one definition requires a person to be
 
 physically absent
 
 , i.e., "not present; not in company; away," while the other, as it pertains to human interaction, requires in its ordinary usage a person to be
 
 physically present
 
 , i.e., "inattentive to persons
 
 present
 
 or to subjects of conversation
 
 in company
 
 ."
 
 Webster's New Twentieth Century Dictionary
 
 (2d unabridged ed.) (emphasis added). See also
 
 Webster's New Twentieth Century Dictionary
 
 (2d unabridged ed.) (defining "inattentive" as "not attentive; heedless; careless; negligent; as, an
 
 inattentive
 
 spectator or hearer"). This makes sense-we do not think of someone who is physically absent as also not fixing or applying the mind steadily. Instead, "inattentive" refers to someone who is physically present but "showing a lack of attention." See
 
 The American Heritage Dictionary of the English Language
 
 (new college ed., 1981), p. 663. These two definitions of "absent"-physically missing and mentally distracted-thus, are not complementary aspects of a singular definition; they are two logically inconsistent alternative definitions, of which we must "choose and apply the most contextually appropriate." See
 
 Reading Law
 
 , p. 70, and note 15 of this opinion.
 

 The majority is conflicted regarding how to treat the dictionary: is it the "first point of reference,"
 
 ante
 
 at 318, or simply "one data point ... [that] guides our analysis, but it does not by itself settle it,"
 
 ante
 
 at ----? The latter characterization, it seems to me, is just another way of saying that the majority does not like the answer that the dictionary provides. There are many ways that "an uncritical approach to dictionaries can mislead judges ...."
 
 Reading Law
 
 , p. 415 (discussing the use of "unreliable" and "threadbare" definitions). Not surprisingly, definition-shopping is high on the list. See
 
 id
 
 . at 418 (stating, as a "primary principle[ ] ... in using dictionaries," that "[b]ecause common words typically have more than one meaning, you must use the context in which a given word appears to determine its aptest, most likely sense"). Instead of locating the aptest definition in this context, the majority rewrites the statute by creating a third definition more to its liking-one that is unknown to any dictionary.
 

 See
 
 ante
 
 at ----. I do not agree with the majority, however, when it seems to say the complete opposite. See
 
 ante
 
 at 315 ("These provisions all describe a situation in which, in effect, a spouse has initiated conduct that results in the complete dissolution of his or her marriage, either in fact or in practice.");
 
 ante
 
 at 316 ("[W]illful absence requires consideration of the totality of the circumstances. It presents a factual question for the trial court to answer: whether a spouse's complete absence brought about a practical end to the marriage.");
 
 ante
 
 at 318 n. 9 ("[T]he trial court should ascertain whether that spouse has been
 
 completely
 
 absent from the spouse, both emotionally and physically.");
 
 ante
 
 at ---- (defining "absent" as "complete physical and emotional absence" and stating that the statutory scheme "contemplates that one only loses his or her status as a 'surviving spouse' if he or she takes action that is akin to a complete repudiation of the marriage");
 
 ante
 
 at ---- ("[C]ourts should evaluate whether complete physical and emotional absence existed, resulting in an end to the marriage for practical purposes."). Under the majority's view, it seems that the spouse must initiate conduct that he or she knows would result in the termination of the marriage, and the spouse must be successful in doing so. That sounds an awful lot like intent. The majority's interpretation twists like a pretzel here as well.
 

 Finally, it is worth noting that the majority's newfangled legal concept of a "practical" end to a marriage is vague and unsupported. It appears that the majority believes a marriage effectively ends, for these purposes, when there is a "complete" physical and emotional absence. Why must the absence be "complete"? And what can it possibly mean to be "completely" emotionally absent from someone? How will a court possibly make this determination?
 

 Webster's New Twentieth Century Dictionary
 
 (2d unabridged ed.).
 

 See
 
 Krohn
 
 ,
 
 490 Mich. at 156-157
 
 ,
 
 802 N.W.2d 281
 
 . The majority fails to recognize this alternative definition of "willful" or provide any rationale for its decision to give that term such a strained meaning in this context.
 

 See also
 
 The Oxford English Dictionary
 
 (2d ed.) (defining "willful" as "[a]sserting or disposed to assert one's own will against persuasion, instruction, or command; governed by will without regard to reason; determined to take one's own way; obstinately self-willed or perverse"). Although we disagree on which definition applies, I agree with the majority that it does not matter whether the term "willful" is a term of art because the lay and legal dictionaries contain similar sets of definitions. See
 
 Hecht v. Nat'l Heritage Academies, Inc.
 
 ,
 
 499 Mich. 586
 
 , 621 n. 62,
 
 886 N.W.2d 135
 
 (2016) ("If the definitions are the same in both a lay dictionary and legal dictionary, it is unnecessary to determine whether the phrase is a term of art, and it does not matter to which type of dictionary this Court resorts."). The legal dictionary at the time of the statute's drafting defined "willful" as having a unilateral component: "[i]ntractable; having a headstrong disposition to act by the rule of contradiction."
 
 Black's Law Dictionary
 
 (revised 4th ed.).
 

 While unnecessary to my interpretation, it is worth noting that my view is also consistent with the Reporter's Comments to RPC § 290, the statute from which MCL 700.2801(2)(e) was derived. The Reporter's Comments explain that "[MCL 700.2801(2)(e) ] describes unilateral actions that are not approved or condoned by the decedent spouse before death." Martin & Harder, Estates and Protected Individuals Code with Reporters' Commentary (ICLE, 2018), p. 154.
 

 Many divorce statutes that predated no-fault divorce legislation explained "desertion" by reference to a "willful absence." And one treatise from 1873 explains that, like our reading, to be granted a divorce due to "willful absence" a plaintiff must not have agreed to the absence-"because, if the plaintiff had consented to the absence, he would be barred on the ground of connivance[.]" 1 Bishop,
 
 Commentaries on the Law of Marriage and Divorce
 
 (5th ed.), § 775, p. 664.
 

 See
 
 ante
 
 at ----. As discussed above, in addition to excluding a "willfully absent" spouse, MCL 700.2801(2)(e) also excludes
 

 [a]n individual who ... for 1 year or more before the death of the deceased person:
 

 * * *
 

 (
 
 ii
 
 ) Deserted the decedent spouse.
 

 The word "desertion," whether read as a legal term of art or according to its ordinary use, includes as an element the intent not only to be physically absent, but to permanently abandon. See
 
 Black's Law Dictionary
 
 (10th ed.) ("The willful and unjustified abandonment of a person's duties or obligations.").
 
 Black's
 
 explains further that, "[i]n family law, the five elements of spousal desertion are (1) a cessation of cohabitation, (2) the lapse of a statutory period, (3) an intention to abandon, (4) a lack of consent from the abandoned spouse, and (5) a lack of spousal misconduct that might justify the abandonment."
 
 Id
 
 . "Abandon," in turn, is defined as "[t]o desert or go away from permanently." See also
 
 Webster's New Twentieth Century Dictionary
 
 (2d unabridged ed.) (defining "desert" as "to forsake; to leave in the lurch; to abandon; to quit with a view not to return to"). Cf.
 
 The Random House Dictionary of the English Language
 
 (1966) (defining "desert" as "to leave (a person, place, etc.) without intending to return, esp. in violation of a duty, promise, or the like; abandon; forsake"). This reflects our treatment of the term "desertion" in the divorce context, in which we held that desertion could not be found when the parties were considering whether to resume their status as husband and wife, i.e., when a spouse had not yet demonstrated an intent to permanently depart from the marriage. See
 
 Rudd v. Rudd
 
 ,
 
 33 Mich. 101
 
 , 102 (1875) (holding that proof the parties considered living together again "goes to negative the proposition that either party considered that matrimonial cohabitation was not to be resumed or continued," and for that reason, a bill for divorce based on desertion could not be maintained); see also
 
 Rose v. Rose
 
 ,
 
 50 Mich. 92
 
 , 92,
 
 14 N.W. 711
 
 (1883) ("To make out a case for the dissolution of marriage on this ground [i.e., desertion] there must be satisfactory proof of three things:
 
 First
 
 , cessation of cohabitation ;
 
 second
 
 , an intent in the mind of the defendant to desert [i.e., leave permanently] ; and,
 
 third
 
 , that the separation was against the will of the complainant.").
 

 See
 
 Warner v. Warner
 
 ,
 
 54 Mich. 492
 
 , 494-495,
 
 20 N.W. 557
 
 (1884) ("[A husband] as completely commits the crime of desertion when by his cruel conversation and conduct, he compels [his wife] for safety to leave him and his home, as when he willfully and without cause leaves and abandons her."); see also Bishop, § 791 (noting that a spouse can desert his or her spouse by engaging in "ill conduct" with the intent that the other spouse leave).
 

 For example, the majority notes that MCL 700.2801(e)(
 
 ii
 
 ) and (
 
 iii
 
 ) each include requirements that "involve intentional acts that bring about a situation of divorce in practice ...."
 
 Ante
 
 at 315. Putting aside whether that is correct (and I doubt that it is), the majority does not grapple seriously with whether that same requirement pertains to MCL 700.2801(e)(
 
 i
 
 ). The majority does not, for example, purport to apply any canon of interpretation, such as the associated-words canon, which holds that words associated by context "should be assigned a permissible meaning that makes them similar."
 
 Reading Law
 
 , p. 195. In such cases, the "common quality suggested by a listing should be its most general quality-the least common denominator, so to speak-relevant to the context."
 
 Id
 
 . at 196. The majority's interpretation does not attempt to reflect the "most general quality" of the listed items. I fail to see how the majority's newly conceived "quality" of a complete physical and emotional absence leading to de facto divorce could have possibly been the "most general quality" the Legislature meant to capture with this list.
 

 On remand, I would direct the trial court to consider the length of time apart, the fact that James consented to a support order providing Maggie and their children with financial assistance, the statements in the 2010 complaint that Maggie and James filed in their joint suit against General Motors, and any other evidence bearing on this question.